UNITED STATES of America,
Plaintiff–Appellee,

v.

CERTAIN REAL PROPERTY LOCATED AT 16510 ASHTON, DETROIT, WAYNE COUNTY, MICHIGAN, Together with All Improvements, Fixtures and Appurtenances; Certain Real Property Located at 23080 Valley Crest, Southfield, Oakland County, Michigan, Together with All Fixtures, Improvements and Appurtenances, Defendants,

Raymond Earl Durr, Claimant–Appellant.

No. 93–2301.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 18, 1994.

Decided Feb. 27, 1995.

---

Kathleen Moro Nesi, Asst. U.S. Atty. (argued), Kathleen Moro Nesi, Asst. U.S. Atty., Joyce F. Todd (briefed), Detroit, MI, for U.S.

S. Allen Early, III, Law Offices of S. Allen Early, Detroit, MI (argued and briefed), for Raymond Earl Durr.

Before: ENGEL, MARTIN, and BOGGS, Circuit Judges.

MARTIN, J., delivered the opinion of the court. ENGEL, J. (p. 1472), delivered a separate concurring opinion. BOGGS, J. (pp. 1472–75), delivered a separate dissenting opinion.

BOYCE F. MARTIN, Jr., Circuit Judge.

Raymond Earl Durr seeks to contest the civil forfeiture proceedings brought by the United States against two houses, one in Detroit and another in Southfield, Michigan. The district court granted summary judgment in favor of the United States on the basis that Durr could neither establish standing to claim an interest in the properties nor prove innocent ownership. Durr appeals that decision. For the following reasons, we reverse.

Anita Durr, Raymond Durr's niece, testified under oath that she met and began seeing Solomon Israel sometime in the early 1980s. Although not married, the two began living together in Detroit around Christmas of 1983. Israel is the father of two of Anita Durr's five children. While living together, Israel worked as a tailor, and then started his own tailoring business. According to Anita Durr, Israel's tailor shop made up to four thousand dollars a day at times, depending on the season. Anita Durr worked at the tailor shop as well, although she did so without pay. Her work there generated money to cover household and other expenses. Israel's tailor shop closed in January 1992 due to an employee's moving away and the resulting loss of business when Israel was unable to find a comparable tailor to replace him. However, in addition to the tailor shop, Anita Durr testified that Israel bought and sold jewelry to support the family.

While living with Anita Durr, Israel purchased the Detroit house, 16510 Ashton, and began renovating it. He then bought the house in Southfield, 23080 Valley Crest, because they needed a bigger place. Anita Durr and her five children moved into the Valley Crest house in 1988; they lived there until the time it was seized in 1992. Israel visited them on Valley Crest regularly but never lived there himself. Anita Durr explained that he became religious and felt that their continued living together was inappropriate. For two years however, from July 1989 to July 1991, Anita Durr held joint title to the Valley Crest house with Solomon Israel until she quit claimed her interest to Israel. Unfortunately, her relationship with Israel did not last; the two separated in 1991.

In early 1992, Anita Durr became concerned with her financial and living situation. She believed Israel was about to get married and stop providing support for her children. She complained to her uncle, Raymond Durr, about having quit claimed her interest in the Valley Crest house. She feared that Israel would get married, sell one or both houses, keep the money, and leave the children with nothing. Thus, she asked for Raymond's

help in securing an interest in the houses. Raymond Durr testified under oath that he spoke with Israel about Anita Durr's concerns. Israel informed Raymond that he did not trust Anita's ability to handle the finances and pay the bills. According to Raymond, Israel explained that the Detroit house had to be sold to provide money for the other's expenses. Israel felt that Anita and the children should remain in the Valley Crest house. With this in mind, Israel quit claimed his interest in the two houses to Raymond Durr so that Raymond could "do the right thing" for Anita and her children.

According to Raymond Durr, the two understood that the Detroit house was to be sold and its proceeds used to pay off the Valley Crest house and provide money for Anita. Israel, however, continued to live in the Detroit house, to manage its sale, and to make payments on the Valley Crest house until June 1992. Raymond Durr conceded that he knew Israel was behind on payments for the Valley Crest house at the time he quit claimed his interest. Nevertheless, Durr made no effort to discern what the payments and expenses were, or if and when they were being made. He relied instead on being told when help was needed, and planned to use his savings to provide the required financial assistance. The quit claim deeds were executed in February and March 1992, but were not recorded until July 7, 1992. Raymond Durr put the deeds away after receiving them; he recorded them only after Anita Durr informed him that a search warrant had been executed at the Valley Crest house. Anita claimed that the executing officers made allegations about Israel, both houses, and drug trafficking. Raymond Durr testified that the deeds were then recorded to show that *he* was really the owner of both houses and not Israel.

The search of the Valley Crest house was executed as part of an investigation by the Drug Enforcement Administration. The DEA was primarily investigating the drug trafficking activities of three individuals: John Journe, Basim El–Amin, and Solomon Israel, who was also known as Marcus Richards before changing his name. It appears that this investigation centered on Journe,

who, according to informants, received several kilograms of cocaine each month. In documents found during the execution of a search warrant at Journe's residence, Israel was purportedly linked to money laundering for the "Journe organization." Israel had previously been convicted for possession of cocaine in 1985 and arrested two other times for narcotics offenses. Confidential informants, whom Durr maintains are all convicted felons lacking any indicia of reliability, told DEA agents about delivering heroin to Israel's tailor shop and picking up large amounts of cash at the Valley Crest house.

Based on this information, federal agents obtained a search warrant for the Detroit house and Valley Crest. During the execution of the warrants on July 2, 1992, records were found documenting large expenditures by Israel, expenditures seemingly beyond his means. Beyond these records, the only somewhat incriminating evidence found were money wrappers, for $5,000 amounts, in the Valley Crest house, and what the United States characterizes as "drug paraphernalia" in the Detroit house. In actuality, this paraphernalia was approximately 1,000 glassine envelopes. Also, "Katie," a drug sniffing dog, alerted in the vicinity of a safe in the Detroit house. However, not found in either house was any trace of drugs, large amounts of cash, or guns. Nor was any more obvious paraphernalia discovered.

Curiously, no criminal charges were brought as a result of these searches. The record offers little explanation for this. It appears that John Journe is now deceased. Killed *prior* to the searches, in March 1992, his body was found in the trunk of an automobile parked at Detroit's Metropolitan Airport. At some point, Basim El–Amin was convicted of drug trafficking after a controlled buy of narcotics. No explanation has been given for why charges have not been brought against Israel, and at oral argument the Assistant United States Attorney was unable to offer one, relying instead on the fact that no criminal charges need be brought at all in conjunction with a civil forfeiture case. In any event, five days after the searches, Raymond Durr recorded the quit claim deeds to these properties. Then,

despite the apparent fact that no individual has ever been prosecuted in connection with these searches and the "evidence" uncovered, the United States pursued an *in rem* forfeiture action against the properties.

On August 19, 1992, the United States filed its complaint for forfeiture of these properties, alleging as its basis 21 U.S.C. §§ 881(a)(6) and (a)(7). In support of the seizure warrant, the United States filed the affidavit of Special Agent Daniel Krause. The same affidavit was submitted to support the seizure warrants for both the Detroit and Southfield houses as well as other property not involved here. The affidavit describes the DEA's investigation of Journe, Israel, and El–Amin. Much of the affidavit is concerned with allegations of Journe's drug activities. Aside from the allegations of confidential informants, the affidavit refers to Israel's arrest in 1978 for trafficking of heroin, his conviction for possession in 1985, and his arrests for possession on two other occasions in that same year. It mentions that he was detained at Metropolitan Airport in Romulus, Michigan, because he possessed over $90,000 in jewelry; however, no indication is made of any seizure or arrest on this occasion. We note for that matter that the only "conviction" mentioned in the affidavit is that for possession in 1985; the affidavit does not relate the disposition of the other arrests. Instead, it goes on to state that seventeen automobiles were registered in Israel's name, or an alias, and to various addresses connected to either Israel or Journe. It then declares that Israel filed no tax returns from 1985 to 1991. However, despite this failure to file returns, the affidavit then details seized documents and subpoenaed records that indicate several large cash payments made by Israel during that time.

On September 1, 1992, Raymond Durr filed a verified claim as owner of both the Detroit and the Valley Crest houses. He later filed an answer to the forfeiture complaint on September 21. Israel also filed a verified claim, but failed to file an answer to the complaint. Consequently, a default judgment was entered against Israel on October 7. Inexplicably, Anita Durr has never filed a claim in this action, although she lived in the Valley Crest house with her children for several years prior to its seizure.

Raymond Durr moved for summary judgment on September 22, claiming that the complaint lacked probable cause and raising the innocent owner defense. After the United States filed a cross-motion for summary judgment, the district court held hearings on these motions before granting summary judgment for the United States. In so ruling, the court felt that several factors were determinative: Durr paid nothing for either property; he did not exercise dominion or control over them; he had no financial stake in them; he had no possessory interest in either property; he could not make required payments; he recorded the deeds *after* the searches; and he held naked title at best. The court concluded that record evidence made clear that the United States would be able to prove probable cause at trial and that Durr could not establish standing or prove innocent ownership.

On appeal, Raymond Durr makes four arguments. First, he contends that the district court's refusal to allow an adversarial hearing on the probable cause issue violated the Due Process Clause of the Fifth Amendment. Next, Durr argues that it was error to grant summary judgment for the United States because he presented evidence showing that a genuine issue of material fact existed. Durr also claims that the case should have been dismissed because the United States failed to demonstrate probable cause for the forfeiture. Finally, Durr asserts that the district court's failure to assess the proportionality of the forfeiture violated the Eighth Amendment's prohibition on excessive fines. The United States responds that standing is a threshold issue that precedes considering whether probable cause existed. According to the United States, since Durr did not demonstrate any dominion or control over these properties, he has not established sufficient standing to contest this forfeiture.

■ This Court reviews a grant of summary judgment in a forfeiture action *de novo*, viewing the facts in the light most favorable to the non-moving party. *United States v. $53,082.00 in United States Currency*, 985 F.2d 245, 248 (6th Cir.1993). Under Federal

Rule of Civil Procedure 56(c), summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. We believe Durr's Fifth Amendment Due Process right to a pre-seizure hearing, as articulated in *United States v. James Daniel Good Real Property*, ─── U.S. ───, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), was violated. Because we find this issue to be dispositive, we need not address Durr's other arguments.

The complaint for forfeiture in this case was brought pursuant to 21 U.S.C. § 881(a) (1988 & Supp. V 1993). That section provides that property furnished "in exchange for a controlled substance" or "traceable to such an exchange" is subject to forfeiture. 21 U.S.C. § 881(a)(6) (1988). It further provides that any real property used to facilitate the commission of a narcotics offense punishable by more than one year in prison is subject to forfeiture as well. 21 U.S.C. § 881(a)(7) (1988). Specifically, the civil forfeiture provision of the Controlled Substances Act provides, in pertinent part:

the following shall be subject to forfeiture to the United States and no property right shall exist in them:

.        .        .        .        .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter. . . .

(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole or any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment. . . .

21 U.S.C. §§ 881(a)(6), (a)(7) (1988). Under Section 881, the United States bears the initial burden of demonstrating probable cause of "a substantial connection between the property and the underlying criminal activity." *$53,082.00*, 985 F.2d at 250 (quoting *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1136 (6th Cir.1989)). Thus, the United States is required to establish "a reasonable ground for belief, supported by more than mere suspicion, that there is a substantial connection between the seized [property] and an illegal drug transaction." *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 284 (6th Cir.1992).

In granting summary judgment for the United States, the district court concluded that Durr could not establish standing to contest the forfeiture. The United States, in responding to Durr's appeal of that decision, emphasizes the same argument, relying upon two recent decisions of this Circuit, *United States v. 526 Liscum Drive*, 866 F.2d 213 (6th Cir.1989), and *United States v. 37.29 Pounds of Semi–Precious Stones*, 7 F.3d 480 (6th Cir.1993). The United States reasons that Durr can do no more than prove bare legal title and argues this is insufficient to establish standing as a claimant to contest a forfeiture action. In making our decision, we look first to prior decisions of this Court.

*526 Liscum Drive* involved the forfeiture of real property under the Controlled Substances Act, 21 U.S.C. § 881. In that case, a search of the property pursuant to a warrant yielded four and one-half ounces of heroin, drug paraphernalia, and over $19,000 cash, some of which had been used to make undercover drug purchases. *526 Liscum Drive*, 866 F.2d at 215. After the search, the United States instituted forfeiture proceedings against the property. In contesting that forfeiture action, the claimant could only show bare legal title, presenting no evidence other than that the property was titled in her name. "[T]he district court found that bare legal title, in the absence of dominion, control or some other indicia of ownership, is insufficient to establish standing to challenge the seizure." *Id.* at 216. In reviewing that decision, we agreed with the district court that the claimant failed to satisfy her burden to establish standing. In doing so, we noted that the "claimant has the burden of proving *an interest in the property* sufficient to establish her standing under the statute to

contest the seizure and resulting forfeiture." *Id.* (emphasis added). We declined to decide, however, whether standing is a " 'threshold' issue which precedes consideration of the existence of probable cause for the seizure." *Id.* at 216 n. 2.

In *Semi–Precious Stones,* we were again faced with the issue of standing to contest a forfeiture action. There, we said

> A person must have standing to become a claimant in a forfeiture action brought by the United States. A claimant party must prove that it possessed an interest in the seized property sufficient to satisfy standing requirements in order to permit a federal court to jurisdictionally recognize its entitlement to contest forfeiture. *United States v. $364,960 in U.S. Currency,* 661 F.2d 319, 326 (5th Cir.1981). "A claimant need not prove the merit of his underlying claim, but he must be able to show *at least a facially colorable interest* in the proceedings sufficient to satisfy the case-or-controversy requirement." *United States v. One 18th Century Colombian. Monstrance,* 797 F.2d 1370, 1375 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987).

*Semi–Precious Stones,* 7 F.3d at 483 (emphasis added). While we did not explicitly state that standing is a threshold issue, the Fifth Circuit decisions referred to and quoted make it implicit. "[A] party seeking to challenge the government's forfeiture of money or property used in violation of federal law must *first* demonstrate an interest in the seized item sufficient to satisfy the court of its standing to contest the forfeiture." *$364,- 960,* 661 F.2d at 326 (emphasis added) (citing cases from the Fifth and other circuits).

We believe these decisions have been superseded, however, when applied to the factual situation in this case, in light of *Good Real Property,* —— U.S. ——, 114 S.Ct. 492 (1993). In that case, the court addressed the question of "whether, in the absence of exigent circumstances, the Due Process Clause of the Fifth Amendment prohibits the [United States] in a civil forfeiture case from seizing real property without first affording the *owner* notice and an opportunity to be heard." *Id.* at ——, 114 S.Ct. at 497 (empha-sis added). It answered this question in the affirmative, finding the existence of a Due Process right that was not afforded to Raymond Durr in this case.

Unlike the instant case, drugs were found in *Good Real Property.* A search uncovered roughly eighty-nine pounds of marijuana, marijuana seeds, hashish oil, and other paraphernalia; Good pleaded guilty to a state crime and received a year in jail, five years' probation, and a fine. *Id.* Over four years later, the United States filed an *in rem* action seeking to forfeit the real property involved. Good filed a claim for the property and challenged the seizure as a deprivation of his property without due process of law. *Id.* at ——, 114 S.Ct. at 498. The court agreed with Good on this issue. It first noted the general rule "that individuals must receive notice and an opportunity to be heard before the [United States] deprives them of property." *Id.* It then discussed whether the Fourth Amendment was the sole constitutional provision at issue in forfeiture cases and decided it was not. "Though the Fourth Amendment places limits on the Government's power to seize property for purposes of forfeiture, it does not provide the sole measure of constitutional protection that must be afforded *property owners* in forfeiture proceedings." *Id.* at ——, 114 S.Ct. at 500 (emphasis added). From this conclusion, the court then discussed what procedure was due a property owner under the Due Process Clause.

The court first noted that prior cases to consider Due Process in *ex parte* seizures dealt with personal property. In such a case, the ability of the owner to frustrate forfeiture by removing, destroying, or concealing the property, "created a 'special need for very prompt action' that justified the postponement of notice and hearing until after the seizure." *Id.* (quoting *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 678, 94 S.Ct. 2080, 2089, 40 L.Ed.2d 452 (1974)). The same cannot be said regarding the forfeiture of real property, which "can be neither moved nor concealed." *Id.* Only in extraordinary situations are exceptions to the general rule of pre-deprivation notice and hearing tolerated in any forfeiture case.

When real property is involved there are even fewer tolerable exceptions. Under the three-part inquiry of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the court then weighed the competing interests involved to determine whether the seizure of real property justifies such an exception. *Id.*

To begin, the court noted that when real property is seized, it deprives the person of "valuable rights of *ownership.*" *Good Real Property,* —— U.S. at ——, 114 S.Ct. at 501 (emphasis added). Thus, "the private interests at stake in the seizure of real property weigh heavily in the *Mathews* balance." *Id.* Further, the court deemed the risk of error when conducting *ex parte* seizures to be unacceptable. "The *ex parte* preseizure proceeding affords little or no protection to the innocent owner." *Id.* at ——, 114 S.Ct. at 502. Moreover, the court went on to note that

> the availability of a postseizure hearing may be no recompense for losses caused by erroneous seizure. Given the congested civil dockets in federal courts, a claimant may not receive an adversary hearing until many months after the seizure. And even if the ultimate judicial decision is that the claimant was an innocent owner, or that the Government lacked probable cause, this determination, coming months after the seizure, "would not cure the temporary deprivation that an earlier hearing might have prevented."

*Id.* (quoting *Connecticut v. Doehr,* 501 U.S. 1, 3, 111 S.Ct. 2105, 2108, 115 L.Ed.2d 1 (1991)). This seems to be precisely the case here given the United States' position.

Finally, the court turned to the third part of the *Mathews* inquiry: the interests of the United States. It found that the *ex parte* seizure of real property is not necessary to achieving the goals of Section 881(a)(7). The interests of the United States "at the inception of forfeiture proceedings are to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment. These legitimate interests can be secured without seizing the subject property." *Id.* at ——, 114 S.Ct. at 503. Indeed, there are various means short of

seizure available to the United States to protect its interests. "There is no reason to take the additional step of asserting control over the property without first affording notice and an adversary hearing." *Id.* Thus, the court held that "the seizure of real property under § 881(a)(7) is not one of those extraordinary instances that justify the postponement of notice and hearing. Unless exigent circumstances are present, the Due Process Clause requires the [United States] to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture." *Id.* at ——, 114 S.Ct. at 505. Here, Raymond Durr was afforded neither.

■ In the instant case, we are not presented with any exigent circumstances. In *Good Real Property,* the court recognized a Due Process right to *preseizure* notice and hearing for *owners* of real property. Having recorded his quit claim deeds, Raymond Durr's ownership of the Detroit and Southfield houses was uncontested on appeal. Rather, in arguing that he lacked standing, the United States conceded that Raymond Durr is the nominal owner, holding bare legal title to the properties. The United States was even aware of this fact at the time it instituted forfeiture proceedings. A title search on the Valley Crest house run August 18, 1992, showed Raymond Durr's quit claim deed from Solomon Israel recorded July 7. Even the dissent acknowledges that "the *owner* gets notice and opportunity for a predeprivation hearing." Here, Raymond Durr *is* the owner; whether or not he proves to be a straw man at the hearing, as the record title holder, he is entitled to notice and a hearing before being deprived of his interest in the property.

■ While the affidavits of interest filed by the United States with respect to each property might have afforded Durr notice of the proceedings, they did not provide him a meaningful opportunity to be heard prior to the seizure. The Due Process Clause, however, requires both preseizure notice and opportunity to be heard when the United States seeks the forfeiture of real property. *Good Real Property,* —— U.S. at ——, 114 S.Ct. at 505. Durr, as record owner of the

properties, was entitled to a preseizure adversarial hearing in order to contest the United States' showing of probable cause and establish himself as an innocent owner. To adopt the position of the United States here would be to leave Durr and others similarly situated in a Catch–22: as owners of real property, they have a Due Process right recognized by the Supreme Court to a preseizure hearing; yet, being unable to show more than legal title, they lack standing under our prior decisions to challenge the forfeiture and receive the hearing to which Due Process entitles them.

Because Durr was not afforded a meaningful opportunity to be heard prior to the seizure of his real property, his Due Process rights were violated and we therefore REVERSE.

ENGEL, Circuit Judge, concurring.

If Raymond Earl Durr's only connection with the forfeited property were that of a naked title holder whose deed was recorded after the execution of the search warrants, I might agree with the trial judge's determination that he lacked standing to contest the forfeiture. The record before us, however, shows much more than that, as Judge Martin's opinion recites. Raymond Durr clearly sets forth the physical possession of the premises by his niece, Anita Durr, and the relationship between them and Israel, and I find it capable of at least prima facie belief because it makes sense. Parties close to one another often make similar conveyances with an intent to govern their relationship with the property. Here Anita was the mother of two of Israel's children, and she and they needed a home. It was at least asserted, and some evidence seems to support the assertion, that Anita was not very financially responsible. Israel would have a legal obligation to provide for his two children. Given his impending marriage to someone else, it is not illogical that he would wish to assure them a roof over their heads by executing a deed to Anita's uncle, who could then exercise some degree of financial responsibility on her behalf.

Of course, these assertions may or may not prove at trial to be true, but the allegations have a sufficient ring of truth to persuade me that this case presents far more than a merely formal transfer of title to avoid forfeiture. I agree with Justice Douglas that " 'Generalizations about standing to sue are largely worthless as such,' *Data Processing Serv. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1969), and with Judge Tamm that standing to sue is 'one of the most amorphous concepts in the entire domain of the public law.' *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859, 861 (1970)." *Fridrich v. Bradford,* 542 F.2d 307, 315 (6th Cir.1976) (n.21). Taking instead a practical, realistic view of standing, it seems to me that the relationships of these parties to the land is such that the uncle deserves at least the right to contest the forfeiture. I therefore concur.

BOGGS, Circuit Judge, dissenting.

I believe that the majority has misperceived the holding of the Supreme Court in *United States v. James Daniel Good Real Property,* — U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) and, in doing so, has wrongly overruled the clear precedent of this Circuit. I therefore dissent.

This case asks us to address a narrow, but nonetheless important, question. Does Raymond Durr have standing to contest the forfeiture of two pieces of real property? To have standing to contest a civil forfeiture of real property Durr must show two things. First, he must demonstrate statutory standing. Durr has done this by filing a timely verified claim. Second, Durr must have Article III standing, as he must in every action brought in a federal court.

As the court correctly notes, standing is a threshold issue in this Circuit. Not only do the cases cited in *United States v. 37.29 Pounds of Semi–Precious Stones,* 7 F.3d 480, 483 (6th Cir.1993), clearly state that standing is a threshold issue, but this court held in *Semi–Precious Stones* that "[a] person must have standing to become a claimant in a forfeiture action brought by the United States. A claimant must prove that it possessed an interest in the seized property sufficient to satisfy standing requirements in order to permit a federal court to jurisdic-

tionally recognize its entitlement to contest forfeiture." *Semi–Precious Stones,* 7 F.3d at 483. This is the result reached in every Circuit that has addressed the issue. *See, e.g., United States v. $191,910.00 U.S. Currency,* 16 F.3d 1051 (9th Cir.1994); *United States v. $38,570 United States Currency,* 950 F.2d 1108, 1111 (5th Cir.1992); *United States v. Real Property at 5000 Palmetto Dr.,* 928 F.2d 373, 375 (11th Cir.1991). *See also* David B. Smith, Prosecution and Defense of Forfeiture Cases ¶ 9.04, 9–62.7 (1994) (If the contrary were the law, "then persons with no interest whatsoever in seized property could make a handsome living filing claims").

The issue, then, is whether Durr has standing to contest the seizure of the property. Absent standing, Durr cannot contest the government's probable cause. The effect of Durr's possession of bare legal title on his standing is clear. It is not enough. The Sixth Circuit's prior holdings are unambiguous:

> We hold that when the government establishes probable cause to believe that a claimant is merely a nominal or straw owner, as it has done here, a claimant cannot meet its burden of establishing standing to challenge a forfeiture by presenting proof of legal title alone. The claimant also must present evidence of dominion and control or other indicia of true ownership.

*United States v. 526 Liscum Drive,* 866 F.2d 213, 217 (6th Cir.1988). Therefore, under current Sixth Circuit jurisprudence we must determine whether there is probable cause to believe that Raymond Durr is a straw man.[1] Clearly there is.

Does the purported transferor of the property, Solomon Israel a/k/a Marcus Richards, have a motive to seek a straw man? An Ohio court convicted Israel of felonious assault and discharge of an automatic pistol in 1978. Israel was convicted of possession of a controlled substance in 1985. He has also been arrested on three other occasions for narcotics violations. Informants implicated Israel in a drug conspiracy involving John Journe and Basim El–Amin. A jury convicted El–Amin of conspiracy to possess with intent to distribute five or more kilograms of cocaine. This conviction was the result of a controlled delivery of cocaine to El–Amin by the DEA. This Circuit dismissed his appeal. *United States v. El–Amin,* 979 F.2d 852 (6th Cir. 1992). Journe was murdered, his body found in the trunk of a car in the parking lot at the Detroit Metropolitan Airport.[2] A search warrant executed at Journe's residence revealed financial records implicating Israel in a scheme designed to launder the proceeds from drug transactions. A search warrant executed at Israel's home revealed an ability to spend a great deal of money with very little taxable income.

Durr claims that Israel owned a tailoring shop that, in certain seasons, made $4,000 a day. His federal tax returns list negative income of $1,727 in 1986, $15,000 in 1987 (Israel filed a new tax return in 1992 claiming $20,000 in additional income), and $2,000 in 1988 (Israel filed a new tax return in 1992 claiming $14,000 in additional income). Israel never filed any federal tax returns after 1988.

Israel's lifestyle was commensurate with income far higher than this. A few examples will suffice. In 1987 he purchased the Detroit home at issue here with a down payment of $31,000 and a $419 per month mortgage. In 1989 he installed a swimming pool at his house. The government alleges that this pool cost approximately $32,000. The government also alleges that he had monthly expenses of approximately $20,000. Furthermore, Israel owned, in his name or under a known alias, at least seventeen automobiles. The inventory included a 1929 Buick, two Mercedeses, two BMWs, two Rolls Royces, a Porsche, and a Bentley. At a minimum, it is

---

1. This is different from a determination of whether there is probable cause to support the forfeiture, an issue not before the court.

2. The testimony of both Anita and Raymond Durr is difficult to decipher. However, it appears that Journe and El–Amin were brothers. Journe's live-in girlfriend was June Durr, Anita Durr's cousin, and the claimant's daughter. A third property, 19318 West Ten Mile Road, was also part of this forfeiture action in the district court. The property, the forfeiture of which was apparently uncontested, was Journe's place of business.

clear there is some manner of financial chicanery afoot here.[3]

Finally, the search of Israel's home uncovered money wrappers used to bundle cash in $5,000 units. The investigating officers also found approximately one thousand small glassine bags, which the government and the district court classified as drug paraphernalia. Also found was a photograph of an apparently armed Solomon Israel holding a hoard of cash in front of him. There can be no reasonable argument made that Israel did not have a motive to seek out a straw man to hold title for his property.

Equally relevant is Durr's behavior. Did he behave like straw man? Durr received the properties by quitclaim deed. Durr never paid anything for either parcel nor did he bother to record the deeds until after the government searched the premises.[4] Furthermore, Durr admitted he had no financial stake in the properties and that he never made any payments on the mortgages or land contracts. Durr admitted that he did not know whether the payments on the mortgage or land contract were delinquent. In fact, Israel made all of the payments and handled all of the financial obligations. Durr never contacted the mortgage holder or the land contract holder to tell them he was the new owner. Durr admittedly did not have the resources to pay the utilities, taxes, repairs or any other expenses associated with the property, and he never did so. Durr never lived in either property or exercised any control over them. In fact, he never even visited the properties after Israel quitclaimed them to him. Finally, even after

Israel quitclaimed the property to Durr, Israel listed the property for sale with a broker, purporting to be the owner. Durr knew nothing of this.

Clearly, Israel has a motive to seek out a straw man and Durr has behaved like one. The government has demonstrated that there is probable cause to believe that Durr is a straw man. The issue, then, is whether Durr has provided any facts that either put the government's version in doubt, or that show that he has exercised dominion and control over the property. Durr argues that he held the property in trust for the benefit of his niece. None of the deeds purporting to convey the property to Durr contain any mention of a trust. Furthermore, his conduct regarding the property is not consistent with that of a trustee.[5] Finally, calling him a "trustee" does not alter any of the facts that make the district court's finding of no standing correct.

The court dismisses the clear teaching of *Liscum Drive* and *Precious Stones* by stating that the recent Supreme Court case, *United States v. James Daniel Good Real Property*, —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), alters the required analysis. There is no evidence in *Good* for this statement. *Good* is not a case about standing, about straw men, or about nominal ownership. This Circuit and other Circuits have a well-developed body of law on standing (at least until this case) in civil forfeiture actions, and there is no indication that *Good* worked any change in that law. In *Good*, the claimant held legal title for the house, resided in the house before, during, and after the crimi-

---

3. Durr explains the presence of these items by stating that Israel operated an automobile consignment business. Why it was necessary to hold the title of some of these cars under an alias is not explained. A similar explanation is given for the expensive jewelry found in the house, and for the $90,000 in jewelry in Israel's possession when he was stopped at a local airport. Furthermore, the lavish lifestyle lived by Israel is explained by these "businesses" and the claim that his tailoring business would make upwards of $4,000 a day. Durr makes no attempt to explain how these apparently prosperous businesses yielded no taxable income. Naturally, Israel has not provided a deposition or an affidavit to support Durr's statements.

4. The evidence supporting Durr's representations that he received the deeds in February or March, *see* op. at page 1467, is contradictory at best.

5. The operation of this "trust" agreement is difficult to understand. On the one hand, both Anita and Raymond Durr state that they were concerned that Israel would leave without providing support for Anita and the children. On the other hand, after he allegedly secured title to the homes Durr did nothing to help his niece secure financial independence. Notably, he failed to record the deeds, though he knew enough to do so immediately after the search. Instead, he merely relied on Israel to continue paying the mortgages and providing money for the upkeep.

nal activity, paid for the upkeep of the house, and generally acted as would any other owner of real property. The government never attacked his standing to contest the forfeiture. Finally, the Court never raised the issue of standing in *Good,* either explicitly or implicitly.

This sweeping change in our Circuit's law of standing in civil forfeiture cases stems, according to the court, from the statement in *Good* that "in the absence of exigent circumstances, the Due Process Clause of the Fifth Amendment prohibits the [United States] in a civil forfeiture from seizing real property without first affording the *owner* notice and opportunity to be heard." (emphasis added). This quotation, however, blatantly begs the question at the heart of *this* case. The very issue here is not whether the *owner* gets notice and an opportunity for a predeprivation hearing. Of course he does. The question is whether Durr has demonstrated that he is, in fact, the owner, rather than merely a straw man fronting for Solomon Israel. This Circuit and others have made a "candid determination that things are often not what they appear to be, especially in the world of drug trafficking and other illegal operations. In brief, people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name." *United States v. One 1977 36 Foot Cigarette Ocean Racer,* 624 F.Supp. 290, 292 (S.D.Fla.1985). We, like every other circuit, look beyond formal title to the conduct of the parties.

A strong motivation behind the court's opinion appears to be a concern that the

government never criminally prosecuted Israel.[6] Of course, the law is clear that there is no requirement that the government indict, prosecute, or convict anyone before pursuing civil forfeiture.[7]

Because the court's opinion causes a wholesale change in the law of standing in forfeiture cases, and because it does so by relying on an opinion that has nothing to do with standing, I **DISSENT**.[8]

---

6. The court's comment that in *Good* drugs were found in the house and none were found here is irrelevant. The government can seek forfeiture for property which is used to facilitate a drug transaction, as in *Good,* or property which is purchased with the proceeds of drug transactions. Both accusations are clearly stated in the government's forfeiture complaint.

7. Furthermore, in at least one circuit the decision to pursue criminal prosecution precludes a later civil forfeiture action on double jeopardy grounds. *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210 (9th Cir.1994). In fact, the government often chooses to pursue civil remedies rather than criminal sanction in many areas of the law including, most obviously, the tax

laws, and the Sherman Act. The fact that the government has chosen to pursue a civil action and not a criminal complaint is completely irrelevant.

8. The reasoning of the concurrence adds little to the court's opinion. Our standard of review is not whether Durr's story is "capable of at least prima facie belief because it makes sense" or whether "the allegations have a sufficient ring of truth." It is whether Durr has offered facts buttressing his claim of being a trustee for Anita Durr. He has not offered a single one. The relation of Anita Durr and Israel might give Anita Durr standing; it does nothing to explain away all of the facts showing that Raymond Durr never had any interest beyond naked title.