**UNITED STATES of America, Plaintiff,**

v.

**PROPERTY IDENTIFIED AS LOT NUMBERED 718, et al., Defendants.**

Civil Action No. 96–2100–LFO.

United States District Court, District of Columbia.

July 29, 1998.

Robert Edward Lee Eaton, Jr., William Rakestraw Cowden, Linda Otani McKinney, William Barrett Wiegand, III, U.S. Attorney's Office, Washington, DC, for U.S.

Marvin D. Miller, Alexandria, VA, for Defendants.

## MEMORANDUM

OBERDORFER, District Judge.

This case poses a novel legal question about the limits of the federal government's power of civil forfeiture when waging its war on drugs. Claimant Kimberly Honesty contends that the United States violated her due process rights when, without notice or an adversarial hearing, it secured an *in rem* arrest warrant on her home and allegedly used the threat of eviction as leverage in settlement negotiations over its claim on a second parcel of property. The contours of the issue here are provided by the Supreme Court's decision in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), which held that a government seizure of real property during a civil forfeiture case implicates the Due Process clause. Because the United States acted outside those constitutional contours in this case, claimant's Motion to Dismiss—treated as a motion for summary judgment pursuant to Fed.R.Civ.P. 12(c)—will be granted.

### I.

On September 10, 1996, the United States filed a civil forfeiture complaint against Lot 718 of the Burleigh Manor land development, an unoccupied parcel of property in Howard County, Maryland ("Burleigh Manor"). The deed for the property lists Kimberly Honesty and her husband Kevin as the owners. The United States amended its complaint three days later, adding as defendants two other properties that are deeded to the Honestys but located in Prince George's County. One, identified as 14509 Jones Bridge Road in the town of Bowie, is Kimberly Honesty's residence ("Jones Bridge Road" or "residence"). The other, 7127 Cross Street in Forestville, has not been at issue in this case since May 16, 1997, when an Order granted the government's unopposed motion to strike Kimberly Honesty's claim for it.

The government's forfeiture case derives from its suspicions that Kevin Honesty is a major cocaine distributor with little legitimate income. The nine-count amended complaint alleges that there is probable cause to believe Kevin Honesty purchased the three properties with illegally laundered drug proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Attached to the complaint is the affidavit of Special Agent Joseph Gabor of the Drug Enforcement Administration, which discusses an extensive criminal investigation of Honesty's activities. The government asserts that, consistent with the practice of money launderers, Kevin Honesty co-titled the properties in his and his wife's name. The amended complaint seeks civil forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A), provisions enacted by Congress to assist law enforcement efforts to combat the drug crisis.

### A.

The filing of this suit set in motion several events prescribed by the federal procedures that govern civil forfeiture actions. Pursuant to Rule C(3) of the Federal Supplemental Rules for Certain Admiralty and Maritime Claims, the Clerk of this Court issued an *in rem* arrest warrant for each property at the time it was named a defendant. On the afternoon of September 13—the same day the amended complaint was filed and the warrants were issued—the U.S. Marshal's Service served copies of each on the three defendant properties. *See* Pl.'s Mot. for

Summ. J., Ex. 1. (Apparently, it accomplished this by "posting [the warrant and complaint] in a conspicuous place on the property." Pl.'s Opp. to Claimant's Mot. Dismiss, at 3; *see also* Tr. of 10/6/97, at 8.) Also, according to a notice of service in the record, on that same afternoon the Marshal's Service personally served Kimberly Honesty at her place of employment at the General Services Administration. *See* Pl.'s Mot. for Summ. J., Ex. 1.

██ In late September 1996, the government took two additional steps to further its forfeiture efforts. As required by Rule C(4) of the Federal Supplemental Rules for Certain Admiralty and Maritime Claims, the government "cause[d] public notice of the action and arrest to be given in a newspaper of general circulation"—specifically, the *Washington Law Reporter,* the *Howard County Times,* and the *Prince George Journal. See* Pl.'s Mot. for Summ. J., Exs. 3–5. At around the same time—the precise moment is not evident—the government filed notices of lis pendens in the Maryland land records for the three properties. Under both federal and state law, *see* 28 U.S.C. § 1964; Md. St. Spec. P., subtit. BD, these notices place all prospective transferees on constructive notice that a lawsuit is pending against them. *See generally DeShields v. Broadwater,* 338 Md. 422, 659 A.2d 300, 305–07 (Md.1995).

Despite the posting of her residence, personal service at her workplace, and three public announcements, Kimberly Honesty contends that she only learned of the lawsuit after the notices of lis pendens were filed. At the time this lawsuit commenced, the Jones Bridge Road residence and Burleigh Manor lot were both on the market for sale. During a routine title search, prospective buyers of Burleigh Manor discovered the lis pendens and notified the Honestys of it in late September. At approximately the same time, Chuck Ottley, the real estate agent listing Jones Bridge Road, received a telephone call from someone identifying him or herself as a federal agent. The individual told him, "Well, you might as well forget about that commission because it's—you know, that's probably never going to sell.

We are involved in that. It's not going to sell." Tr. of 12/8/97, at 30. Kimberly Honesty responded a few days later by telling Ottley to "take it [Jones Bridge Road] off the market. Nothing else I can do with it." *Id.*

On October 1, 1996, Kimberly Honesty filed a verified claim on all three properties. On October 21, she answered the amended complaint. Meanwhile, her lawyers negotiated with the government to facilitate the transfer of Burleigh Manor. The sale went forward on December 30, 1996, but only after an agreement was reached. The government withdrew its lis pendens on Burleigh Manor, allowing the transfer of marketable title, in exchange for Honesty's consent to substitute the $56,907.42 in net proceeds as the defendant-res. The Marshal's Service continues to hold this money in escrow, pending the outcome of this suit.

#### B.

The series of events that transpired in the summer of 1997 frame the central issue in Honesty's motion to dismiss. The following facts are undisputed. Unable to draw upon the proceeds from the Burleigh Manor sale, Honesty soon fell steadily behind in her monthly payments to the First National Bank Association, the mortgagee for Jones Bridge Road. Sometime during the mid-summer, the bank decided to foreclose on the residence and scheduled a foreclosure sale for September 24, 1997. An attorney from Covahey & Boozer, a law firm in Towson, Maryland that represents the bank, contacted Assistant U.S. Attorney William Cowden to inquire, in Cowden's words, "whether the lis pendens was going to get in the way of their foreclosure." Tr. of 12/8/97, at 8. (At the time and until recently, Cowden was lead counsel for the United States in this case.) The telephone call concluded after the Covahey & Boozer attorney told Cowden that "they were intent on foreclosing . . . ." *Id.* at 9.

Following this conversation, Cowden placed a call to Marvin Miller, Honesty's attorney. According to Cowden, he told Miller that "he might want to know that [First National Bank Association] were intent on foreclosing because [Honesty] had not paid

the mortgage for some significant period of time." *Id.* at 10. Thus, Honesty's residence "was about to disappear from this picture because the equity was disappearing ...." *Id.* at 10–11. Miller expressed disappointment with the news—apparently the first he had heard of the foreclosure. He volunteered that Honesty believed she could sell Jones Bridge Road herself for a higher price than the bank. At this point, Cowden made a proposal:

> I told Mr. Miller that if that were the case I might consider the following settlement proposal, and that settlement proposal was that she walk away from the equity in the Burleigh Manor property, which is on deposit with the court, and I would contact—recontact the mortgagee and ask the mortgagee if the mortgagee would let Kim Honesty try to sell the [Jones Bridge Road] property without foreclosing.

*Id.* at 11. Cowden insinuated to Miller that he had some leverage to prevent the foreclosure: "I told Mr. Miller ... [t]hat I believed that the mortgagee would allow that to happen if I made that call ... [,] knowing that the mortgagee is going to be fully satisfied and protected ...." *Id.* at 11–12. In contrast, "the mortgagee might not do it with Kim Honesty because she hadn't paid anything in a year ...." *Id.* Miller's recollection confirms this account. *See* Tr. of 10/29/97, at 12–13.[1]

It is also undisputed that Miller, once he learned of the impending foreclosure on the Jones Bridge Road residence, contacted Covahey & Boozer in early September in an attempt to prevent the sale. He communicated "with counsel for the mortgage company, about the existence of the forfeiture suit, that the lis had been filed, that they could not pass clear title." *Id.* at 10. In a September 16 letter to Miller, Thomas Dore of Covahey & Boozer responded that "your assertions that we are unable to foreclose at this time are incorrect." Claimant's Supp. Mem. Mot. Dismiss, Attach. D. Dore explained, "Regarding your assertions with respect to the forfeiture case, please be advised

that *we have been in contact with the U.S. Attorney's Office, and they have agreed to release their claim to this property so that we may proceed with the foreclosure sale.*" *Id.* (emphasis added).

Either before or after the exchange with Dore, meanwhile, Miller rejected Cowden's settlement offer. Accordingly, Cowden made no attempt to intercede with Covahey & Boozer. *See* Tr. of 12/8/97, at 7 ("There was no conversation with me and Mr. Dore about this settlement agreement because Mr. Miller rejected it."). Facing the prospect of an impending eviction from her home, Honesty ultimately filed for bankruptcy to prevent the foreclosure sale. *See* Honesty Aff. in Supp. Mot. Dismiss, ¶ 16.

### C.

The only matter in dispute is the substance of Cowden's remarks in his initial conversation with the unidentified attorney from Covahey & Boozer. To review, three facts about that conversation are uncontested. First, the attorney initiated the telephone conversation, after the bank had decided to foreclose on Jones Bridge Road, to inquire about the government's lis pendens. Second, the conversation concluded when the attorney indicated the bank would proceed with the sale. Third, Thomas Dore from the law firm later advised Miller that "the U.S. Attorney's Office ... [has] agreed to release their claim on this property so that we may proceed with the foreclosure sale." Claimant's Supp. Mem. Mot. Dismiss, Attach. D.

Cowden denies ever suggesting to Dore or anyone else at Covahey & Boozer that the United States would release its claim on Jones Bridge Road. When confronted with Dore's letter, he flatly replied, "The letter is inaccurate." Tr. of 10/29/97, at 25. Instead, Cowden contends he informed the Covahey & Boozer attorney only that the bank held a lien on Honesty's residence superior to the lis pendens notice and the government therefore could not prevent the bank from selling

---

1. There are two transcripts of the motions hearing on October 29, 1997. The first, cited above, corresponds to all but a few minutes near the conclusion of the proceeding. *See* Tr. of 10/29/97, at 37. The second, which will be referred to as the Supplemental Transcript, covers only the missing segment.

it. In each of several accounts of their phone conversation, Cowden casts his reply in the same terms. *See, e.g.,* Tr. of 10/29/97, at 24 ("[W]e filed a civil forfeiture case against the property, you are standing in front of us with a $317,000 mortgage, so we are behind you in line with the mortgage. You're taking the 317,000 if you can get that out of the sale, I can't prevent you from selling that, you have an interest that is superior to our interest in it."); *see also* Tr. of 12/8/97, at 9; Tr. of 10/29/97, at 25; *id.* at 24.

Nonetheless, several portions of the record suggest that Cowden did communicate to Covahey & Boozer a willingness to withdraw the government's claim on Jones Bridge Road. First, of course, there is the September 16 letter from Dore to Miller. Second, Cowden on other occasions indicated that the government would be satisfied with a judgment against Burleigh Manor alone. *See, e.g.,* Tr. of 10/6/97, at 14 ("If the Court rules [Honesty] has no standing on [Burleigh Manor], I believe that the third part of the case, ... the house in bankruptcy proceedings right now we will have to walk away from that, and we would do that."). Indeed, when Cowden presented his settlement offer, it is undisputed that the quid pro quo was Honesty's withdrawal of her claim on Burleigh Manor in exchange for the government's assistance in selling her home, to which the bank had a superior lien.

Third, and most compellingly, a subsequent narrative from Dore confirms that Cohavey & Boozer's business practice is not to proceed with a foreclosure sale unless the government has agreed to release its claim or otherwise negotiates a settlement. While Dore did not testify at the evidentiary hearing on December 8, 1997, he wrote a December 4 letter "to clarify the substance" of "any testimony I would offer." Mot. Quash Subpoena, Ex. A, at 1. Notably, both parties stipulate to the substance of the letter. *See id.*, at ¶ 5; Tr. of 12/8/98, at 19. In it, Dore reaffirms Cowden's assertion that the bank

did not need the government's authorization to conduct a foreclosure sale. *See* Mot. Quash Subpoena, Ex. A, at 2 ("It is my understanding under the law that because we are an innocent lien holder and have a perfected security interest that such interest is superior to the forfeiture case and that the forfeiture case cannot and does not affect our lien."); *see generally DeShields v. Broadwater*, 338 Md. 422, 659 A.2d 300, 306 (Md.1995) ("A lis pendens is ... not notice of an actual lien. Consequently lis pendens proceedings do not technically prevent alienation ....") (internal quotation marks and citation omitted). Understandably, Cowden emphasized this portion of the letter in arguments on Honesty's motion. *See* Tr. of 12/8/97, at 5.

But despite this understanding, Dore's December 4 letter quite clearly explains that Covahey & Boozer does not proceed with a foreclosure sale so long as a notice of lis pendens remains in the land records. He writes:

> [S]ince the docketing of any action which constitutes a Lis Pendens could be considered a cloud on title, we address same. Were we not to address a Lis Pendens action, there could be a potential to chill the sale or limit the possibility of a sale to a third party.

Mot. Quash Subpoena, Ex. A, at 2. Even if the bank's lien on the Jones Bridge Road residence is secure, any subsequent purchaser would acquire a property interest "subject to the results of that pending litigation." *DeShields*, 659 A.2d at 306. Thus, "as a practical matter, it may be impossible to find a buyer ... for property ... to which the United States asserts a legal claim." *In re Newport Savings & Loan Ass'n*, 928 F.2d 472, 479 (1st Cir.1991); *see also* Tr. of 12/8/97, at 31–32 (testimony of Chuck Ottley). Even Cowden confirmed this much. *See* Tr. of 12/8/97, at 5 ("Mr. Dore is correct in his letter when he indicates that having this civil case filed against the property clouds the title ....").[2]

2. During argument on the motion to dismiss, the United States made much of the fact that Honesty sold Burleigh Manor in December 1996 despite the government's forfeiture claim against the property. *See, e.g.,* Tr. of 10/29/97, at 25–26

("[W]e filed a lawsuit, they wanted to sell the unimproved land and they had a buyer for it, they sold the unimproved land, notwithstanding there was a lis pendens the buyer agreed to buy it and they sold and the proceeds were deposited

Dore's December 4 letter demonstrates it would have been inconsistent with Covahey & Boozer's normal course of business to proceed to foreclosure without assurances from Cowden that the United States would disavow its legal claim or otherwise settle. The firm's practice, "upon reviewing a title examination of a property prior to foreclosure when a forfeiture action has been filed and a Notice of Lis Pendens recorded," is to pursue one of three avenues. Mot. Quash Subpoena, Ex. A, at 1.

(1) "to contact the U.S. Attorney's Office and ask them to release their Lis Pendens as to the property such that we may sell the property free and clear of such Lis Pendens provided, of course, that we notify the U.S. Attorney's Office of the results of our sale and advise them if there are any surplus proceeds should they wish to claim through the foreclosure and forfeiture action"; or

(2) "to negotiate a settlement ... such that either the mortgagee is paid off at the time of the settlement agreement or is paid off from the proceeds of an auction conducted by the U.S. Attorney's Office"; or

(3) "if we cannot reach an agreement with the U.S. Attorney's Office, ... [to] recommend to our client that an answer be filed and that the lien holder assert an innocent owner defense in the case and defend the action. This course of action is the most costly and, of course, the course which we try to avoid at all costs."

*Id.* at 1–2.

Dore's September 16 letter to Miller, in turn, reflects his then-present sense impression that the firm had succeeded under the first approach with regard to Jones Bridge Road. *Compare id.* at 1 ("The first course of action would be to contact the U S. Attorney's Office and ask them to release their Lis Pendens as to the property such that we may sell the property free and clear of such Lis Pendens ....") *with* Claimant's Supp. Mem. Mot. Dismiss, Attach. D ("Please be advised

that we have been in contact with the U.S. Attorney's Office, and they have agreed to release their claim to this property so that we may proceed with the foreclosure sale.").

On careful consideration of the record, a trier of fact could only reasonably find that Cowden expressed to the attorney from Covahey & Boozer a willingness to withdraw the government's claim on Jones Bridge Road, upon which expression the attorney and his client relied. This finding takes into account several factors. Notably, the United States introduced no admissible evidence to contradict Dore's stipulated representations about the firm's business practices. The United States declined to offer Cowden's own account of events under oath, despite an express invitation by the Court to do so. *See* Tr. of 12/8/97, at 15. *See generally* Fed. R.Civ.P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading ....."). The United States counseled Thomas Dore, perhaps the only other person who could have confirmed Cowden's version of events, about the terms of a motion to quash a subpoena for Dore's testimony. *See* Mot. Quash Subpoena, Ex. A, at 1 ("It is my intention to file a Motion to Quash the subpoena on the grounds which we discussed.") (letter from Dore to Cowden); *see also id.,* ¶ 5; Tr. of 12/8/97, at 13–14. Even if Cowden's account were in evidence, moreover, it offers no credible explanation for why Covahey & Boozer would have been willing to proceed with the foreclosure sale of Jones Bridge Road while a notice of lis pendens was outstanding.

The Court does not question that Cowden acted with the best of intentions when he pursued settlement of this case. The motives behind the government's conduct are irrelevant. The ultimate legal issue is whether the United States, armed with a mere lis pendens, exercised *de facto* control over Honesty's properties when it, through Cowden, in effect offered to trade its lis pendens power over Jones Bridge Road for

---

in the court. The lis pendens obviously didn't prevent the sale in that case."). Yet this incident only confirms Dore's observation about the difficulty of selling property that is subject to a forfeiture claim. While the closing on Burleigh Man-

or was scheduled for September 1996, it did not occur until December—only after the government agreed to substitute the net proceeds as the defendant-res, thereby releasing any claim on the land itself.

the net proceeds from the sale of Burleigh Manor.

## D.

Before proceeding with the analysis of Kimberly Honesty's legal claims, two remaining undisputed facts bear emphasis. First, the United States has never conducted an adversarial hearing, either before or after filing this suit, where Honesty might have challenged whether the government has probable cause to seize the properties. Second, throughout this litigation and to this day, Kimberly Honesty has lived at the Jones Bridge Road residence as she had before, without any detectable government presence. The U.S. Marshal's Service has never made an effort "to attach the defendant property and to detain it in [its] custody," despite hortatory language in the arrest warrant. *See* Warrant of Arrest In Rem (Sept. 10, 1996), *attached to* Pl.'s Compl. (The warrant quoted herein——the only one in the record——is for Burleigh Manor. Presumably, the language is identical for Jones Bridge Road.)

## II.

In *United States v. James Daniel Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), the Supreme Court held that an *ex parte* seizure of real property under federal civil forfeiture law, absent exigent circumstances, violates the Due Process clause. Respondent-res was a residence titled to James Daniel Good; the United States suspected that Good was using the property to commit or facilitate a federal drug offense. Accordingly, the government filed a civil forfeiture complaint and obtained an *in rem* arrest warrant. Without notice or an adversarial hearing, it executed the warrant on Good's residence, which he was renting to tenants at the time. Rather than evict the tenants, however, the government negotiated an occupancy agreement under which it collected all future rent payments.

In ruling in Good's favor, the Supreme Court rejected the government's contention that drug forfeiture laws are exempt from the usual due process requirements. "The right to prior notice and a hearing is central to the Constitution's command of due process," it held. *Id.* at 53, 114 S.Ct. 492. The Court applied the Due Process clause to Good's case after weighing three conclusions. First, the property interest affected by the seizure was substantial, even though neither Good nor his tenants was evicted. Second, without a pre-seizure adversarial hearing, the risk of an unjustified deprivation was great. Third, the government had no compelling need to seize the property so promptly, either to establish jurisdiction or to ensure that it not be sold, destroyed, or used for illegal activity. Under the three-factor test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court concluded that the government had violated the Fifth Amendment.

The decision in *Good Real Property* draws several distinctions that are important to this case. The Court endorsed the *ex parte* filing of lis pendens notices—"to ensure that the property not be sold ... prior to the forfeiture judgment"—as a constitutional alternative to actual seizure. *Id.* at 58, 114 S.Ct. 492; *see also id.* at 59, 114 S.Ct. 492 (noting that lis pendens is one of "various means, short of seizure, to protect [the Government's] legitimate interests in forfeitable real property."). The ruling expressly does not apply to personal property, which poses a danger of flight and must be physically detained to establish *in rem* jurisdiction. *See id.* at 57–59, 114 S.Ct. 492; *see also Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 678, 679, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (requiring no preseizure notice or hearing when yacht seized under civil forfeiture law). Finally, the opinion does not equate a seizure with an eviction. The government 'seized' the respondent-res principally by collecting rent, *see id.* at 54, 114 S.Ct. 492, thereby "asserting control over the property" sufficient to trigger the procedural guarantees of due process. *Id.* at 59, 114 S.Ct. 492.

At one time or another during extensive arguments on her motion to dismiss, Kimberly Honesty has articulated at least four potential applications of *Good Real Property* to this case. First, she contends that the government unconstitutionally seized both Bur-

leigh Manor and Jones Bridge Road in late September 1996 when it filed notices of lis pendens, restricting her ability to transfer title to the properties. Second, the government seized Jones Bridge Road in December 1996 when it consented to place the Burleigh Manor sale proceeds in escrow, depriving Honesty of a source of income to meet her Jones Bridge Road mortgage payments. Third, the government seized both properties on September 13, 1996 when it posted arrest warrants on them. Fourth, the government seized Jones Bridge Road in September 1997 when it offered to withdraw its claim on the residence, thereby facilitating a foreclosure sale that it then used to pressure Honesty into a global settlement.

■ An earlier Memorandum and Order rejected the first two of Honesty's theories, relying on a summary reading of the *Good Real Property* opinion. *See United States v. Property Identified as Lot Numbered 718*, 983 F.Supp. 9, 11 (D.D.C.1997). The third theory merits closer attention. Honesty relies heavily on the Eleventh Circuit's decision in *United States v. 408 Peyton Road, S.W.*, 112 F.3d 1106 (11th Cir.1997), which held that the posting of an *in rem* arrest warrant, absent a physical taking, was still a seizure that required notice and an adversarial hearing.[3] As in *Good Real Property*, "the Government elected not to evict the residents, post warning signs, or change the locks," even after serving the warrant. *Id.* at 1109. The court applied the Due Process clause because the warrant automatically "bestowed upon the Government important rights of ownership"—such as the power of eviction—even if the government chose to delay exercising those rights. *Id.* at 1110.

The precedential value of *Peyton Road* is in suspension. *See United States v. 408 Peyton Road, S.W.*, 133 F.3d 1378, 1998 WL 27289 (11th Cir. Jan.23, 1998) (vacating panel opinion and ordering rehearing *en banc* ). Regardless, a close reading of *Good Property* appears to foreclose the *Peyton Road* argument. There is some dicta in the Supreme Court's opinion to recommend it. *see, e.g.,* 510 U.S. at 54, 114 S.Ct. 492 ("The seizure of a home .... gives the Government not only *the right* to prohibit sale, but also *the right* to evict occupants, to modify the property, [et cetera] ...."). However, the theory overlooks a core difference between *Peyton Road* and *Good Property*. In the former, the government did nothing actually to disturb the owner's enjoyment of his property. In the latter, the government took "the additional step of asserting control over the property" by collecting rent payments. *Id.* at 59, 114 S.Ct. 492. This factor was central to the Supreme Court's reasoning. *See id.* at 54, 114 S.Ct. 492 ("[E]ven if this were the only deprivation at issue, it would not render the loss insignificant or unworthy of due process protection. The rent represents a significant portion of the exploitable economic value of Good's home.").

Additionally, the *Good Real Property* opinion suggests that physically 'posting' an arrest warrant—precisely what the government did in *Peyton Road*, and here—is a prerequisite to securing *in rem* jurisdiction. *See id.* at 58, 114 S.Ct. 492 ("In the case of real property, the res may be brought within the reach of the court simply by posting notice on the property and leaving a copy of the process with the occupant."). If so, then *ex parte* posting is constitutional.[4] Actually,

---

**3.** A few district courts have also endorsed this theory, mostly within the Eleventh Circuit. *See United States v. Messino*, 871 F.Supp. 1027, 1030 (N.D.Ill.1994); *United States v. 18900 S.W. 50th St., Ft. Lauderdale, Fla.*, 915 F.Supp. 1199, 1202 (N.D.Fla.1994); *United States v. Real Property Located at 3284 Brewster Drive*, 949 F.Supp. 832, 834–35 (M.D.Fla.1996); *Real Property Located at 286 New Mexico Lane*, Civ. No. 95–1088–ORL–19, 1996 WL 732561 (M.D.Fla.1996); *United States v. Two Parcels of Real Property Located at 101 North Liberty St.*, Civ. No. 97–T–862–N, 986 F.Supp. 1376, 1997 WL 732613 (M.D.Ala.1997). *But see United States v. Real Property Known & Numbered as 429 South Main Street*, 906 F.Supp.

1155, 1158–59 (S.D.Ohio 1995) (serving arrest warrant did not constitute *Good Real Property* seizure).

**4.** Or, in the alternative, the Supreme Court intended to require notice and an adversarial hearing before the filing of virtually any civil forfeiture case. This is highly unlikely, and inconsistent with other portions of the opinion. For instance, the Court noted elsewhere that a pre-seizure hearing is not a significant administrative burden "since the Government can wait until after the forfeiture judgment"—which requires an adversarial hearing anyway—"to seize

the *Peyton Road* opinion reads the discussion of jurisdiction in *Good Real Property* differently, to require that the government post a forfeiture complaint but not a warrant. *See Peyton Road*, 112 F.3d at 1113. But this analysis is flawed; it is the arrest warrant, after all, and not the complaint, that secures 'personal' jurisdiction over real property. *See Republic Nat'l Bank v. United States*, 506 U.S. 80, 87, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992) ("[T]he court must have actual or constructive control of the res when an *in rem* forfeiture suit is initiated."). Besides, *Good Real Property* favorably cites to portions of a First Circuit decision that explicitly distinguish posting an arrest warrant from seizing property. *See* 510 U.S. at 58, 114 S.Ct. 492, *citing United States v. TWP 17 R 4, Certain Real Property in Maine*, 970 F.2d 984, 986 & n. 4 (1st Cir.1992); *see generally TWP 17 R 4*, at 990 ("While the posting of an arrest warrant might hinder an owner's ability to sell his/her property, we do not believe that it amounts to such a deprivation of property rights so as to warrant due process protection under the Fifth Amendment.").

Accordingly, the decision here turns principally on Honesty's last "seizure" theory: that the government asserted control over her property when it employed its lis pendens on Jones Bridge Road as a bargaining chip in negotiations about the Burleigh Manor sale proceeds and generally to settle this case. In endorsing the filing of lis pendens notices as an alternative to seizure, *Good Real Property* said nothing about potential abuse of this process. *See* 510 U.S. at 58–59, 114 S.Ct. 492. The Court was clear, however, that it understood lis pendens to serve "[t]he Government's legitimate interests at the inception of forfeiture proceedings ... to ensure that property not be sold ... prior to the forfeiture judgment." *Id.* at 58, 114 S.Ct. 492. This language leaves open the possibility that a lis pendens notice used for other purposes, such as Honesty alleges, may transgress the Due Process clause.

### III.

The Fifth Amendment bars the federal government from depriving any person "of

life, liberty, or property, without due process of law." U.S. Const. amend. V. As in *Good Real Property*, it is necessary to assess Honesty's Due Process claim under the three-part inquiry enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The *Mathews* test balances the private interest that has been affected by the challenged official action; the risk of an erroneous deprivation of that interest through the procedures used, in relation to the probable value of additional safeguards; and the government's interest, including the administrative burden the additional procedural requirements would impose. *See id.* at 335, 96 S.Ct. 893.

### A.

▮ The first consideration, the most contentious in this case, cuts in Honesty's favor. Honesty argues that the government asserted significant control over her home, in derogation of her property rights, when it removed the impediment to a foreclosure sale of Jones Bridge Road, informed her attorney of her impending eviction, and offered to intercede if she dropped her legal claims in this lawsuit. Dismissive of this claim, the government contends that the only 'seizure' looming here was an eviction notice for Jones Bridge Road from the mortgagee, which was undisputably acting on its own initiative. The government agreed to intercede in order to *prevent* the foreclosure sale, moreover, so long as it "had some good faith representation [from Honesty's attorney] ... that he was willing to enter into a settlement agreement." Supp. Tr. of 10/29/97, at 3–4.

What is a seizure? In *Good Real Property*, it was something less than physical eviction—the collection of rent. Under the earlier analysis of the Eleventh Circuit's *Peyton Road* opinion, it is something more than latent legal authority to exercise incidents of ownership, such as an arrest warrant provides, without actually exercising them. Under *Good Real Property*, it is also something

the property." *Id.* 510 U.S. at 59, 114 S.Ct. 492. If posting a warrant is necessary to establish jurisdiction yet tantamount to a seizure,

however, it would be impossible for the government to postpone seizing the property until after a forfeiture judgment.

more than the filing of lis pendens, which merely places others on notice of the pendency of a lawsuit. To seize real property in violation of the Due Process clause, the government must "take the additional step of asserting control over the property without first affording notice and an adversary hearing." 510 U.S. at 59, 114 S.Ct. 492; *cf. United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ("[A] 'seizure' of property occurs [under Fourth Amendment] when there is some meaningful interference with an individual's possessory interest in that property.").

In this case, the United States asserted that control. The United States did not instigate the foreclosure of Jones Bridge Road, *see, e.g.,* Tr. of 12/8/97, at 17, but it provided the necessary assurances that it would release its claim on the property. Next, the government immediately conveyed news of the foreclosure sale to Honesty's attorney. Finally, it offered to assert its influence over the bank—via the very lis pendens it had agreed to withdraw, presumably—in exchange for the settlement most favorable to the government. The turn of events required no explicit threat or ultimatum. Honesty was left with two choices: capitulate to the government's settlement proposal, or face imminent eviction. That she ultimately devised a third, file for bankruptcy, hardly lessened the pressure.

The government is incredulous at the suggestion that it did anything coercive or heavy-handed. Since it can file a notice of lis pendens without triggering the procedural guarantees of due process, it contends, it certainly does not implicate the Constitution by agreeing to *withdraw* a lis pendens and forsake a forfeiture claim. "[O]ur willingess to watch foreclosure occur," according to the United States, is no cause for concern. Pl.'s Supp. Opp. to Claimant's Mot. Dismiss, at 3 n. 1. If that is all the government had done, or if only Jones Bridge Road were at issue, this defense would be valid. But contrary to its representations, the government was not a passive observer here. It accommodated the bank's desire to proceed with a foreclosure sale. It used the bank's interest in Jones Bridge Road in an effort to perfect its own interest in the Burleigh Manor sale proceeds. It seized the opportunity presented by the Covahey & Boozer telephone call, and acted affirmatively to force Honesty's hand.

Honesty's interest is especially great because she faced eviction from her home. As in *Good Real Property* and many other forfeiture cases, it is noteworthy that "the security and privacy of the home and those who take shelter within it" is at stake. 510 U.S. at 61, 114 S.Ct. 492. The Supreme Court did not limit its holding in *Good Real Property* to residences, *see id.,* but it did observe that an individual's "right to maintain control over his home, and to be free from governmental interference, is a privacy interest of historic and continuing importance." *Id.* at 53–54, 114 S.Ct. 492. To paraphrase Justice William O. Douglas, the principle that one's home is his or her castle is basic to our system of jurisprudence. *See Lombard v. Louisiana,* 373 U.S. 267, 275, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963) (Douglas, J., concurring).

### B.

The second consideration, the risk of an erroneous property deprivation in relation to the value of an adversarial hearing, also favors Honesty's claim. As in *Good Real Property*, the procedure followed by the government in this case "creates an unacceptable risk of error" because it "affords little or no protection to the innocent owner." 510 U.S. at 55, 114 S.Ct. 492. The lawsuit commenced without any independent determination of probable cause. *See, e.g.,* Rule C(3), Supplemental Rules for Certain Admiralty and Maritime Claims. "The Government is not required to offer any evidence on the question of innocent ownership or other potential defenses a claimant might have." *Good Real Property*, at 55, 114 S.Ct. 492. As described above, moreover, the government pursued a settlement of its Burleigh Manor claim that would have obviated its need to argue and prevail upon the merits.

In fact, the risk of an erroneous deprivation was even greater in this case than in *Good Real Property*. In the latter, at least, the government still faced a post-seizure hearing at which it would have to prove

probable cause for forfeiture. While such a hearing " 'would not cure the temporary deprivation that an earlier hearing might have prevented,' " *id.* at 56, 114 S.Ct. 492 (quoting *Connecticut v. Doehr*, 501 U.S. 1, 15, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991)), it could at least restore property that was wrongfully seized to its rightful owner. Moreover, it would subject the government to possible sanctions or damages for filing a frivolous suit. There were no comparable guarantees here. Had the government succeeded in its efforts to settle, Honesty would be permanently without the Burleigh Manor proceeds and the government's own conduct would be immune from adversarial challenge in either a pre-seizure forfeiture hearing or post-seizure judicial review.

## C.

Under the final *Mathews* consideration, the government's interest in acting without the requisite procedural safeguards, Honesty's claim prevails. Like in *Good Real Property,* the United States lacked a "specific interest in seizing real property before [a] forfeiture hearing." 510 U.S. at 56, 114 S.Ct. 492. The Supreme Court specifically rejected the contention that *ex parte* seizure is necessary to secure jurisdiction or to ensure that the property not be sold, destroyed, or used for illegal activity. *See id.* at 56–59, 114 S.Ct. 492. The United States offers no new arguments or exigent circumstances here. It would be difficult to, because the government had a year after filing suit in which to hold an adversarial hearing. Such hearing would hardly have imposed substantial "administrative burdens." *Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

In *Good Real Property,* the Supreme Court observed that "the Government ... has various means, short of seizure, to protect its legitimate interests in forfeitable real property." *Id.* at 59, 114 S.Ct. 492. One of these, as discussed earlier, is lis pendens. Given the prominent role here of the government's lis pendens notice on Jones Bridge Road, the Court's imprimatur of this process merits some discussion. After all, there is an apparent tension within *Good Real Property,* which endorses lis pendens to prevent the

"[s]ale of property," *id.* at 58, 114 S.Ct. 492, yet elsewhere explains that one of the "valuable rights of ownership" withheld from James Daniel Good was "the right of sale." *Id.* at 54, 114 S.Ct. 492. There is also an apparent tension between *Good Real Property* and earlier Supreme Court precedents, which hold that most other pre-judgment remedies require a due process hearing. *See, e.g., Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (invalidating wage garnishment statute); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (invalidating replevin statute); *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (invalidating attachment statute).

The *Good Real Property* Court did not explain why a lis pendens notice falls "short of seizure" and does not trigger the procedural guarantees of due process. Nonetheless, it is easy to understand how the Court distinguished lis pendens from the seizure of James Daniel Good's residence. "The seizure of a home produces a far greater deprivation" than the mere filing of a lis pendens notice. "[Seizure] gives the Government *not only the right to prohibit sale,* but also the right to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supercede the owner in all rights pertaining to the use, possession, and enjoyment of the property." *Good Real Property,* 510 U.S. at 54, 114 S.Ct. 492 (emphasis added). In contrast, a lis pendens is a comparatively minor obstruction.

Likewise, "lis pendens doctrine ... is unique and distinguishable" from other prejudgment remedies that are subject to the Due Process clause, 14 Richard R. Powell & Patrick J. Rohan, Powell on Real Property ¶ 907.1 (1998). Unlike garnishment, replevin, and attachment, a lis pendens notice does not operate as a lien. While "the successful litigant in [a] court action is granted a priority position based on the date the lis pendens became operative," *id.,* he or she has no interest in the property unless and until a judgment is entered. Thus, lis pendens acts as " 'a general notice of an equity to all the world,' " preserving a litigant's potential future interest in property without actually

preventing alienation prior to judgment. *DeShields v. Broadwater*, 338 Md. 422, 659 A.2d 300, 306 (Md.1995) (citation omitted). The cloud on title that lis pendens causes flows from the underlying forfeiture action, not the notice that a suit is pending.

This case demonstrates how lis pendens, if used other than "to ensure that the property not be sold ... prior to the forfeiture judgment," *Good Real Property*, 510 U.S. at 58, 114 S.Ct. 492, threatens property rights as palpably as many of the other pre-judgment remedies that require a due process hearing. The customary distinction between lis pendens and these other remedies "has merit if one assumes the existence of a legitimate claim to or interest in specific property that is properly the subject of a notice of lis pendens," as one commentator has argued. Janice Gregg Levy, Comment, *Lis Pendens and Procedural Due Process: A Closer Look After* Connecticut v. Doehr, 51 Md. L.Rev. 1054, 1060 (1992). Nonetheless, there are alternative possibilities:

> an erroneous filing, such as a filing against property that is not, in fact, the subject of litigation; a filing against property of a character not subject to a notice of lis pendens; or a filing by a plaintiff who has little chance of success and is using the lis pendens as leverage to secure a settlement. In these cases, it is *not* the suit itself that effects the taking.

*Id.* (footnote omitted). Rather, the lis pendens notice is the culprit.

While the government disparages this commentary, nothing in *Good Real Property* counters the author's reasoning as applied to this case. *See* Pl.'s Supp. Opp. Mot. Dismiss, at 3 n. 1 ("The only authority the Court offers is a law review article that pre-dates *Good* and incorrectly predicts how the Supreme Court would ultimately decide the *lis pendens* issue in *Good*."). The Supreme Court held only that, in light of lis pendens doctrine, the government need not take control of property to protect its legitimate interest in enforcing a potential forfeiture judgment. The conduct of the United States

here—agreeing to withdraw its forfeiture claim on Jones Bridge Road, then offering to change course if Honesty would settle her claim on the Burleigh Manor proceeds—reinforces that it had little expectation of ever acquiring Jones Bridge Road. *See also* Tr. of 10/6/97, at 14. If there is a dearth of judicial authority on point, moreover, it is because absolutely none of the over one hundred federal cases that rely on *Good Real Property* recite facts that resemble these.

Accordingly, the Court holds that the United States violated Kimberly Honesty's right to an adversarial hearing under the Constitution's Due Process clause. The Court makes no finding about the underlying merits of its forfeiture claims against Burleigh Manor and Jones Bridge Road. As the Supreme Court noted, "Fair procedures are not confined to the innocent. The question before us is the legality of the seizure, not the strength of the Government's case." *Good Real Property*, 510 U.S. at 62, 114 S.Ct. 492. The rights at stake here are procedural, not substantive. Had the government afforded Honesty an adversarial hearing before September 1997, its subsequent conduct would not now be subject to constitutional review under the Due Process clause.

## IV.

The only remaining issue is the appropriate form of remedy for the Due Process violation here. Honesty contends that the proper judicial response to an unconstitutional seizure is dismissal of the underlying forfeiture case, as opposed to a timely due process hearing, for example. She relies on rulings from two circuits that advocate dismissal, with leave to re-file if the statute of limitations permits. *See United States v. 2751 Peyton Woods Trail*, 66 F.3d 1164, 1166–67 (11th Cir.1995); *United States v. One Parcel of Real Property Located at 9638 Chicago Heights*, 27 F.3d 327, 330 (8th Cir. 1994); *see also United States v. One Parcel of Real Property with Buildings, Appurtenances and Improvements, Known as Lot Six*, 48 F.3d 289, 291–92 (8th Cir.1995).[5]

---

**5.** A Ninth Circuit opinion also suggests that dismissal without prejudice may be "an appropriate remedy," so long as the constitutionality of a

seizure is challenged at the outset of the suit. *United States v. Real Property Located in El Dorado Cty. at 6380 Little Canyon Road*, 59 F.3d 974,

Without guidance from the Supreme Court, *see id.* at 65, 114 S.Ct. 492 (remanding case "for further proceedings consistent with this opinion"), lower courts have followed divergent approaches. This appears to be an issue of first impression in this Circuit.

One alternative form of remedy, applied in the *Good Real Property* case itself, is damages. Before remand from the Supreme Court, the Ninth Circuit in *Good Property* ruled that James Daniel Good was entitled to recover the rent revenue that the government had wrongfully collected. *See United States v. James Daniel Good Property,* 971 F.2d 1376, 1384 (9th Cir.1992); *see also United States v. Real Property Located at 20832 Big Rock Drive,* 51 F.3d 1402, 1406 (9th Cir.1995) (reaffirming *Good Property* remedy in wake of Supreme Court's decision). As explained by a district court in that circuit, "the purpose of the *James Daniel Good Property* return-of-rents remedy is to restore a claimant whose realty was unconstitutionally seized to the position he or she would have otherwise occupied." *United States v. Real Property Located at Incline Village,* 976 F.Supp. 1327, 1348 (D.Nev.1997). Three other circuits have endorsed this approach. *See United States v. Marsh,* 105 F.3d 927, 931 (4th Cir.1997); *United States v. All Assets and Equipment of West Side Bldg. Corp.,* 58 F.3d 1181, 1193 (7th Cir.1995); *United States v. 51 Pieces of Real Property, Roswell, N.M.,* 17 F.3d 1306, 1316 (10th Cir.1994); *see also United States v. Premises Known as RR# 1, Box 224,* 14 F.3d 864, 869 n. 5 (3d Cir.1994) (suggesting that one suitable remedy under *Good Real Property* may be "damages for the unlawful detention of . . . property").

Another alternative, favored by three circuits, is the suppression of any evidence that the government may have obtained from an unlawful seizure. In a case preceding *Good Property,* the Second Circuit held that "the illegal seizure of property, standing alone, will not immunize that property from forfeiture, so long as impermissibly obtained evidence is not used in the forfeiture proceed-

ing." *United States v. Premises and Real Property at 4492 South Livonia Road,* 889 F.2d 1258, 1265 (2d Cir.1989). The Ninth and Tenth Circuits have adopted this reasoning, along with the return-of-rents approach, in rejecting dismissal as a remedy for unconstitutional seizures. *See 20832 Big Rock Drive,* 51 F.3d at 1406; *51 Pieces of Real Property,* 17 F.3d at 1316.

■ Although it represents the minority view, the remedy of dismissal is the only solution in this case that would afford Kimberly Honesty any meaningful relief. An order to return all rents or profits makes little sense when the property seized is owner-occupied, as here. If constitutional concerns about civil forfeiture are most serious when an individual's home is at stake, *see, e.g., Good Real Property,* 510 U.S. at 53–54, 114 S.Ct. 492, then the resident certainly deserves no less compensation than the landlord. *But see United States v. Various Tracts of Land in Muskogee and Cherokee Counties,* 98 F.3d 1350 (table), Civ. Nos. 95–7154 et seq., 1996 WL 563847, at *1 (10th Cir.1996) (awarding no relief because no evidence of rent); *United States v. All Assets & Equipment of West Side Bldg. Corp.,* Civ. No. 89–2376, 1997 WL 187319, at *5 (N.D.Ill. April 10, 1997) (same).

A broader formulation of damages—to account for Honesty's loss of use and enjoyment of her home, for example, *see El Dorado,* 59 F.3d at 981—is unworkable. Due to the government's disregard for due process, Honesty suffered no apparent diminution of "the exploitable economic value of [her] home." *Good Real Property,* 510 U.S. at 43, 114 S.Ct. 492. In the takings context, this fact is normally dispositive. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that permanent cable wire outside apartment building was a taking), *on remand,* 58 N.Y.2d 143, 459 N.Y.S.2d 743, 446 N.E.2d 428 (N.Y.1983) (affirming award of $1 as just compensation). But here, it is

981 n. 5 (9th Cir.1995). The court declined to dismiss, however, because it applied *Good Property* retroactively to invalidate a government seizure. The dictum conflicts with other rulings in the circuit, which are discussed below. *See gen-*

*erally United States v. Real Property Located at Incline Village,* 958 F.Supp. 482, 492 (D.Nev. 1997) ("*El Dorado*'s discussion of dismissal as a *Good* remedy is . . . of little, if any, precedential weight.").

no measure of the substantial control that the government asserted over Honesty's property. An expert would find it difficult, if not impossible, to quantify the monetary value of that control, or of the procedural guarantees that Honesty was denied. After all, had Honesty settled this case, as the government pressured her to do, she would have had no forum to seek relief. Consequently, damages seem a particularly ill-suited remedy to the constitutional violation in this case.

The suppression-of-evidence remedy offers no consolation either. The Second Circuit case that first crafted this form of relief is readily distinguishable from the case at hand. In *4492 South Livonia Road*, the government pursued civil forfeiture under 21 U.S.C. § 881(a)(7), which governs property that is used to facilitate the commission of narcotics offenses. *See* 889 F.2d at 1259; *see also 20832 Big Rock Drive*, 51 F.3d at 1405 (same). *But see 51 Pieces of Property*, 17 F.3d at 1308 (property allegedly purchased as part of money laundering scheme). Where the government suspects that property is facilitating illegal activity, an *ex parte* seizure may well uncover evidence to confirm those suspicions. The suppression of evidence that would otherwise prove a forfeiture case arguably eliminates the government's incentive to ignore due process.

But where, as here, the government suspects that property has merely been purchased with the proceeds of illegal activity, an *ex parte* seizure is far less likely to uncover relevant evidence. In this case, after all, the government pressured Honesty to settle, not to produce incriminating evidence. It exerted control over Honesty's property so that it could *avoid* having to prove its case on the merits. *Good Real Property* also lends support to this distinction. The Supreme Court rejected the government's suggestion that compliance with the Fourth Amendment's search and seizure requirement insulated it from a Fifth Amendment due process challenge. The Court held:

> [T]he purpose and effect of the Government's action in the present case go beyond the traditional meaning of search and seizure. Here the Government seized property not to preserve evidence of wrongdo-

ing, but to assert ownership and control over the property itself.

510 U.S. at 52, 114 S.Ct. 492. It would be inappropriate, therefore, to remedy an unconstitutional seizure under *Good Real Property* with the customary relief for a Fourth Amendment violation.

Honesty is entitled to a meaningful remedy, because "even ... temporary or partial impairments to property rights ... are sufficient to merit due process attention." *Connecticut v. Doehr*, 501 U.S. 1, 12, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). Nothing short of dismissal achieves this objective. Having declared bankruptcy, Honesty is no longer subject to the pressures exerted on her property by the government. Neither damages nor suppression of evidence is well-tailored to the government's conduct here. Given the substantial powers that civil forfeiture laws vest in the government—exercised to the fullest extent in this case—the remedy of dismissal is commensurate with the offense. *See generally United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1070–71 (9th Cir. 1994) ("[C]ivil forfeiture statutes ... impose 'quasi-criminal' penalties without affording property owners all of the procedural protections afforded criminal defendants.").

The accompanying order grants Honesty's motion to dismiss with one caveat. Pursuant to the Eighth and Eleventh Circuit rulings, the government will have leave to pursue forfeiture against Jones Bridge Road and the Burleigh Manor proceeds again if the statute of limitations permits. Ironically, this provision harmonizes with the rationale other circuits have used to reject the dismissal remedy. *See, e.g., 4492 South Livonia Road*, 889 F.2d at 1265 ("[T]he illegal seizure of property, standing alone, will not immunize that property from forfeiture ...."); *Marsh*, 105 F.3d at 933 (Hall, J., concurring and dissenting in part) ("An illegal initial seizure of property no more shields it from subsequent forfeiture than an illegal arrest immunizes a person from subsequent indictment or conviction."). Indeed, because cash poses an even greater danger of flight than a criminal suspect who is detained under a faulty arrest warrant, the accompanying order directs the U.S. Marshal's Service not to release the

Burleigh Manor sale proceeds until August 12, 1998.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 29th day of July 1998 hereby

ORDERED: that claimant's Motion to Dismiss [58], treated as a motion for summary judgment pursuant to Fed.R.Civ.P. 12(c), is GRANTED; and it is further

ORDERED: that on August 12, 1998 the U.S. Marshal's Service shall release to claimant the $56,907.42 in net proceeds from the sale of defendant-res Burleigh Manor, unless the United States files a new forfeiture complaint and executes an *in rem* arrest warrant against said proceeds; and it is further

ORDERED: that claimant's Motion to Compel [37] is DISMISSED AS MOOT; and it is further

ORDERED: that plaintiff's Motion for Summary Judgment [53] is DENIED; and it is further

ORDERED: that claimant's Request for a Status Conference on Mutually Agreed Date [96] is DISMISSED AS MOOT; and it is further

ORDERED: that claimant's Motion for Appropriate Relief [97] is DISMISSED AS MOOT; and it is further

ORDERED: that plaintiff's Motion for Extension of Time to File Opposition to Claimant's Motion for Appropriate Relief [98] is DISMISSED AS MOOT.