174 F.3d 720
 UNITED STATES of America, Plaintiff-Appellee,
v.
REAL PROPERTY LOCATED AT 1184 DRYCREEK ROAD, GRANVILLE, OHIO
43023, Defendant,
Charles William O'Brien, Claimant-Appellant (97-4158),
Winterhaven Trust; R.J. Adams, Trustee, Claimant-Appellant (97-4160).
 Nos. 97-4158, 97-4160.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 29, 1999.
Decided April 23, 1999.
 
 Marcia J. Harris (argued and briefed), Office of the U.S. Attorney, Columbus, OH, for Plaintiff-Appellee in No. 97-4158.
 James D. Owen (argued and briefed), Columbus, OH, for Defendant, Claimant-Appellant in No. 97-4158.
 Marcia J. Harris (briefed), Office of the U.S. Attorney, Columbus, OH, for Plaintiff-Appellee in No. 97-4160.
 James D. Owen (argued), Columbus, OH; Gina M. Dougherty (briefed), Columbus, OH, for Defendant, Claimant-Appellant in No. 97-4160.
 Before: KENNEDY, DAUGHTREY, and CLAY, Circuit Judges.
 KENNEDY, J., delivered the opinion of the court, in which CLAY, J., joined. DAUGHTREY, J. (pp. 732-733), delivered a separate opinion concurring in part and dissenting in part.
 KENNEDY, Circuit Judge.
 
 
 1
 Claimants Charles W. O'Brien and Winterhaven Trust appeal the district court's decision to grant civil forfeiture under 18 U.S.C. § 981 of real property located at 1184 Drycreek Road, Granville, Ohio, 43023. In its complaint for civil forfeiture in rem, the government alleged that the property was forfeitable to the United States because it was property obtained by bank fraud, and was proceeds of or was used to facilitate bank fraud and related money laundering in violation of 18 U.S.C. §§ 1956, 1957, and 1344. Claimants Winterhaven Trust ("the Trust") and Charles O'Brien ("O'Brien") contend that the district court erred in granting the government's motion for in rem forfeiture in the absence of pre-seizure notice and hearing, and that the district court erred by failing to suppress the seizure of the property as a remedy for the government's warrantless search, seizure and confiscation of the property and its contents. The Trust alone also contends that the district court erred by granting the government's motion for summary judgment on the forfeiture, by forfeiting the real property in violation of the Eighth Amendment's prohibition against excessiveness and disproportionality, and by failing to grant a stay of the forfeiture proceedings while criminal charges related to the same or similar conduct were pending against one of the claimants. For the reasons set forth in the following opinion, we shall affirm.
 
 I. BACKGROUND
 
 2
 Claimant Charles W. O'Brien ("O'Brien") is a Columbus, Ohio area businessman with multiple real estate holdings. He had been a customer of Bank One since at least 1971. The instant action arises from a series of transactions between O'Brien and Bank One, as well as other Ohio financial institutions, in which O'Brien sought loans using the defendant property as collateral.
 
 A. Ownership of the defendant property
 
 3
 On January 28, 1980, Bank One made a demand loan of $85,000 to O'Brien for the purpose of purchasing the defendant residential property, located at 1184 Drycreek Road, Granville, Ohio. The property had been damaged in a fire prior to O'Brien's acquisition and O'Brien told the bank that he intended to use the loan to make repairs. O'Brien told the bank that he would repay the loan by means of permanent financing from another bank.
 
 
 4
 Over the next several years, Bank One made numerous other demand loans to O'Brien. In May and September 1980, the bank loaned O'Brien a total of $45,000 to cover the costs of renovating the defendant property. As Bank One was confident that he would repay, the bank made another loan to O'Brien in November 1980 for $268,000 secured by a mortgage on the defendant property and other collateral. In June 1981, O'Brien obtained another loan from Bank One for $290,000, which he indicated was primarily for renovation of other rental properties, and the remainder of which would finance renovation of the defendant property. This loan was secured by mortgages on properties other than the defendant property.
 
 
 5
 On August 21, 1981, without the knowledge or consent of Bank One, O'Brien and his wife, Karen O'Brien, deeded the defendant property to an entity called the Heidi Development Corporation ("HDC"), which O'Brien controlled. O'Brien nevertheless continued to seek loans from Bank One using the defendant property as collateral. Bank One loaned O'Brien $920,000 in September 1981, secured in part by the defendant property (which Bank One estimated at the time to be worth $160,000). The bank loaned O'Brien $421,000 in February 1982, secured in part by a third mortgage on the defendant property. On June 21, 1982, O'Brien promised Bank One a payment of $120,000 in exchange for a release of the mortgages on the defendant property. O'Brien also promised to sell the defendant property and other real estate in order to reduce his indebtedness to Bank One below one million dollars. The bank was never paid and no such sale occurred.
 
 
 6
 When Bank One learned in August 1984 that Franklin County, Ohio had initiated an action against O'Brien for delinquent taxes, it identified O'Brien as a risk and rated his account as a "problem loan." By January 1987, the bank's relationship with O'Brien had significantly deteriorated due to the bank's inability to collect on his delinquent accounts. At this point O'Brien owed the bank approximately $1.5 million.
 
 
 7
 Also in 1987, O'Brien's legal secretary, Tammy Cordell, went to one of Bank One's branches to attempt to secure three satisfactions of mortgage. Apparently she did not involve either Philip Parker or David Pearce, who had handled O'Brien's prior transactions with the bank, in this particular transaction. The mortgage satisfactions that she obtained showed the signatures of Dean Lucas, a branch manager, and Patrick Hughes, another branch employee who ostensibly signed as a witness. The satisfactions reflected that they were executed on March 30, 1987. They were not recorded, however, until three months later, on June 2, 1987. When the releases were finally recorded, they reflected satisfactions of the three notes on the defendant property, for $920,000, $421,500, and $268,000, respectively. Hughes later testified at the probable cause hearing that he could not remember signing any mortgage releases for these sums. He testified that Lucas was not authorized to release any mortgage exceeding $30,000, and that he would have remembered if Lucas had released any mortgages in excess of that amount.
 
 
 8
 In between the execution and recording dates of the releases, and unbeknownst to Bank One, the defendant property was deeded from HDC to Drycreek Corporation, which O'Brien also controlled. In November 1987, O'Brien led Parker and Pearce to believe that he had arranged an arms' length sale of the defendant property to an entity called Hicks Development Corporation for $125,000. Neither knew at the time that O'Brien had already transferred title to the property some six years earlier. Based on O'Brien's representations, Bank One took $125,000 to be the market value of the property and accepted $112,500 in cash and a one-year $12,500 note, later changed to a $6,250 note, from O'Brien in exchange for releases of the mortgages on the defendant property. Those mortgage releases were never recorded and no sale of the property to Hicks Development Corporation ever transpired. O'Brien simply funneled hundreds of thousands of dollars of funds from other sources through Ohio bank accounts that he controlled, eventually converting them into cashier's checks with the remitter listed as "Hicks Development Corporation" to resemble proceeds of an arms' length sale.
 
 
 9
 On November 30, 1990, Drycreek Corporation, then the record owner, deeded the defendant property to Charles A.P. Guillaume ("Guillaume"), who at one time had been the boyfriend of O'Brien's daughter, Kelly. The signature "Pamela Mahaffey," the name of O'Brien's former secretary, appeared on the deed with a notary stamp. Mahaffey testified that she never notarized the deed. A second deed, which appeared to be a photocopy of the first, but which added the word "Trust" after "Guillaume," was filed. Guillaume himself had no knowledge of this "trust." He testified that he neither owned the defendant property, nor served as trustee of the property, nor had any dealings with Winterhaven Trust, to whom the property was later transferred. He was completely unaware that the defendant property had been transferred to him by the Drycreek Corporation, and never saw the deed transferring the property to him until it was shown to him at his deposition. Guillaume also testified that both Kelly and her father told him that the Drycreek Road property belonged to O'Brien. On January 21, 1993, Tammy Cordell, acting as trustee for the Charles A.P. Guillaume Trust, deeded the defendant property to the Winterhaven Trust, R.J. Adams/Trustee.
 
 
 10
 Between the dates of the transfers of the defendant property from Drycreek Corporation to Charles A.P. Guillaume Trust, and then to Winterhaven Trust, a woman by the name of Joyce Farley worked for and lived with O'Brien. Farley testified that O'Brien forged names and created and used signature stamps in other persons' names, and that he had admitted to her that he filed fraudulent mortgage releases. She testified that he told her that it was "easy" to file the fraudulent releases because "[b]anks, basically, were stupid."
 
 
 11
 O'Brien's own daughter, Holly, corroborated Farley's testimony regarding his unauthorized use of signature stamps. From 1983 to 1988, Holly worked for her father and signed checks at his direction on a number of different accounts. She testified that she believed O'Brien had forged her name to legal documents without her consent by using her signature stamp without her knowledge.
 
 
 12
 Russell J. Adams, the Trustee of Winterhaven Trust, indicated that he first learned that he had been named Trustee on January 21, 1993, when Tammy Cordell asked him to notarize the deed transferring the defendant property to Winterhaven Trust from the Charles A.P. Guillaume Trust. Apparently no one asked him to serve as Trustee; Adams simply observed upon notarizing the deed that he was already named Trustee in the document. Adams testified that he never possessed any trust documents and was never paid as Trustee. Any information he had about the Trust came from O'Brien, and to Adams' knowledge, the only property involved in the Trust was the defendant property. Adams, as Trustee, received no correspondence relating to the Trust other than a letter from O'Brien's former attorney, nor did he ever receive any lawsuits, liens or other notices regarding the defendant property.
 
 
 13
 When Adams notarized Tammy Cordell's signature on the deed transferring the defendant property from the Charles A.P. Guillaume Trust to the Winterhaven Trust, he had no idea what the Guillaume Trust was. Adams only learned from O'Brien who the beneficiaries of the Winterhaven Trust were (i.e., O'Brien's children) after the seizure of the defendant property and 60 days before his own deposition. Adams never spoke to the children in his capacity as Trustee.
 
 
 14
 B. Seizure and forfeiture of the defendant property
 
 
 15
 On September 16, 1993, a federal grand jury for the Southern District of Ohio returned an indictment against O'Brien alleging fourteen counts of bank fraud under 18 U.S.C. §§ 1344 and 2, four counts of money laundering in violation of 18 U.S.C. §§ 1957 and 2, and one forfeiture count under 18 U.S.C. § 982 involving criminal proceeds of $219,569.81 (property other than the real estate involved in this civil forfeiture action). In the criminal case, the United States applied for and was granted a Temporary Restraining Order (TRO) by the district court to restrain the property named in the indictment and any substitute assets that would satisfy the $219,569.81 alleged to have been laundered.[1] The TRO was ultimately converted into a Preliminary Injunction by the district court on October 20, 1993.
 
 
 16
 Also on September 16, 1993, the United States filed a complaint for civil forfeiture alleging that the defendant property was forfeitable pursuant to 18 U.S.C. § 981 because it was property involved in money laundering, in violation of 18 U.S.C. § 1956, and in a scheme to defraud banks, in violation of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") of 1989, 18 U.S.C. § 1344. The complaint asked the court for an arrest warrant in rem to arrest and seize the property. The same day, the Magistrate Judge ordered the arrest of the property and ordered that notice of the action be given in The Newark Advocate, a newspaper of general circulation in the Southern District of Ohio. Service was effected on the defendant property that day, and on Charles O'Brien on September 17, 1993.
 
 
 17
 On January 23, 1995, O'Brien appeared before the district court and pleaded guilty pursuant to a Plea Agreement. He pleaded guilty again in August 1995 to a Superseding Plea Agreement. Under both agreements he also pleaded guilty to the criminal forfeiture count, which involved property other than the parcel at issue here. In this civil forfeiture case, on June 23 and 26, 1995, the Magistrate Judge held an after-the-fact probable cause hearing regarding the seizure of the defendant property. The Magistrate Judge later issued a Report and Recommendation finding that the United States had demonstrated probable cause to forfeit the defendant property and finding that exigent circumstances warranted seizure of the defendant property prior to notice and hearing.
 
 
 18
 After receiving objections only from O'Brien and not Winterhaven Trust, the district court adopted the Magistrate Judge's Report and Recommendation. The United States then filed a motion for summary judgment, which the district court granted after receiving responses from neither O'Brien nor Winterhaven Trust.
 
 II. DISCUSSION
 
 19
 Before reaching the merits of the appeal, we shall briefly address the jurisdictional problem presented by claimant Winterhaven Trust's failure to object to the Magistrate's Report and Recommendation.
 
 A. Winterhaven Trust's Waiver of Appeal
 
 20
 The government argues that Winterhaven Trust should be dismissed from this appeal as it failed to object to the Magistrate's Report and Recommendation finding probable cause for the forfeiture. The Sixth Circuit established in United States v. Walters that failure to file objections within ten days to a Magistrate's Report and Recommendation constitutes waiver of the right to appeal. United States v. Walters, 638 F.2d 947, 949-50 (6th Cir.1981)(footnote omitted); see also Thomas v. Arn, 474 U.S. 140, 153-55, 106 S.Ct. 466, 474-75, 88 L.Ed.2d 435 (1985) (affirming 6th Cir. rule).
 
 
 21
 The court of appeals may, however, excuse default in the interests of justice. Accordingly, we have declined to apply the waiver rule in circumstances essentially analogous to the circumstances in which the "interests of justice" exception to the "plain error" rule of Federal Rule of Criminal Procedure 52(b) would apply. See Thomas, 474 U.S. at 155 & n. 15, 106 S.Ct. at 475 & n. 15. In other words, we decline to apply the waiver rule where the district court's error is so egregious that failure to permit appellate review would work a miscarriage of justice.
 
 
 22
 In the instant case, the Magistrate Judge's Report and Recommendation stated, in no uncertain terms:
 
 
 23
 If any party seeks review by the District Judge of this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties objections to the Report and Recommendation ... The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to de novo review by the District Judge and of the right to appeal the decision of the District Court adopting the Report and Recommendation.
 
 
 24
 The Magistrate's Report was filed on October 3, 1995. Claimant O'Brien did not file objections to the Magistrate's Report until October 23, 1995, after the filing deadline. The district court issued an order adopting the Magistrate's Report and Recommendation on October 25, 1995, apparently unaware of O'Brien's untimely filing. The court subsequently vacated its order to consider O'Brien's objections and allow the United States time in which to file a response to his objections. After receiving the government's reply, O'Brien filed a reply brief on August 8, 1996. Between August and October 1996, the case was transferred from the docket of Judge Dlott to Judge Beckwith. Having fully considered O'Brien's objections, Judge Beckwith issued an order on March 21, 1997 adopting the Magistrate's Report and Recommendation. In light of the district court's decision to allow O'Brien's late filing of objections, Winterhaven Trust would have had ample opportunity to advance its own objections. Moreover, considering that almost a year and a half elapsed before the court issued a final order, Winterhaven Trust slept on its rights. We therefore conclude that the Trust waived its opportunity to appeal and is hereby dismissed. We note in passing that the district court's grant of summary judgment for the defendant was directed in part by its finding that claimant O'Brien "has never established that he has either any ownership or possessory interest in the property." But as the government concedes that O'Brien was the "actual owner" and "had a significant interest in the defendant property," we find he has standing to bring this appeal.
 
 
 25
 B. Excessive penalty, failure to stay forfeiture proceeding,
 
 
 26
 and grant of summary judgment
 
 
 27
 We dispose expeditiously of the arguments that forfeiture of the defendant property violated the Eighth Amendment's prohibition against excessiveness and disproportionality, and that the district court erred in failing to grant a stay of the forfeiture proceedings while criminal charges were pending against O'Brien. Because only Winterhaven Trust raised these arguments and has now been dismissed from the appeal, these two issues are eliminated from our consideration. In addition, only the Trust, and not O'Brien, appeals the district court's finding of probable cause for forfeiture and its grant of summary judgment on the forfeiture to the government.[2] Dismissal of the Trust from this appeal therefore also eliminates these issues from our consideration. The only remaining issues are the propriety of the ex parte seizure and the appropriate remedy for any impairment of claimant O'Brien's rights.
 
 C. Propriety of ex parte seizure
 
 28
 O'Brien contends on appeal that the district court erred in granting the United States' motions for ex parte seizure, and that the appropriate remedy is to set aside the forfeiture and dismiss the case. We review a grant of summary judgment in a forfeiture action de novo, viewing the facts in the light most favorable to the non-moving party. United States v. Certain Real Property Located at 16510 Ashton, Detroit, Wayne County, Michigan, 47 F.3d 1465, 1468-69 (6th Cir.1995)(finding violation of claimant's right to pre-seizure hearing dispositive and declining to address remaining issues); United States v. $53,082 in United States Currency, 985 F.2d 245, 248 (6th Cir.1993).
 
 
 29
 Relying upon the Supreme Court's decision in United States v. James Daniel Good Real Property, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), O'Brien submits that ex parte seizure of the defendant property deprived him of due process. The September 16, 1993 seizure in this case predated the Good decision. Hence, the government acted in compliance with then-existing law by seizing the property only after obtaining a warrant of arrest in rem based on an ex parte showing of probable cause before a neutral magistrate judge. Our analysis must nevertheless address Good, as this matter was on direct appeal at the time of the Good decision. See Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 96-97, 113 S.Ct. 2510, 2517-2518, 125 L.Ed.2d 74 (1993) (new rule of law applies to pending civil cases on direct appeal); United States v. Certain Real Property Located at 16510 Ashton, 47 F.3d 1465, 1470 (6th Cir.1995)(applying Good ).
 
 
 30
 The Supreme Court's decision in Good concerned whether seizure of real property for purposes of civil forfeiture justifies an exception to the general rule requiring pre-deprivation notice and hearing. Good, 510 U.S. at 53, 114 S.Ct. at 501. The Court observed that whether such an exception would be warranted in the case of seizure of real property in an ex parte civil forfeiture proceeding would require "examination of the competing interests at stake, along with the promptness and adequacy of later proceedings." Id. The Court employed the Mathews v. Eldridge three-part inquiry balancing (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value of additional safeguards; and finally, (3) the Government's interest, including the administrative burden that additional procedural requirements would impose. Id. (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). Based upon the "historic and continuing" importance of the private interest at stake--the right to be free from governmental interference--and the absence of any convincing countervailing government needs, the Court held that, absent exigent circumstances, the Due Process clause requires the government to provide notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture. Good, 510 U.S. at 54, 62, 114 S.Ct. at 501, 504.
 
 
 31
 The circuits are not in agreement as to the appropriate remedy where an individual did not receive both pre-deprivation notice and a hearing as required by Good. See United States v. Marsh, 105 F.3d 927, 931 (4th Cir.1997); United States v. All Assets and Equipment of West Side Bldg. Corp., 58 F.3d 1181, 1193 (7th Cir.1995). O'Brien argues in his brief that the appropriate remedy for a Good violation is to set aside the forfeiture and dismiss the case with leave to file a new action if the statute of limitations has not run.[3] See United States v. One Parcel of Real Property, Located at 9638 Chicago Heights, 27 F.3d 327, 330 (8th Cir.1994); United Sates v. Property Identified as Lot 718, 20 F.Supp.2d 27, 39 (D.D.C.1998)(concluding only dismissal would afford meaningful relief when property seized is owner-occupied). The majority of circuits that have addressed this issue, however, have held that a Good violation does not invalidate forfeiture; instead, the government must pay the claimant any damages, such as lost profits or rents, that accrued during the period of the illegal seizure. See e.g., United States v. Marsh, 105 F.3d 927, 931 (4th Cir.1997); United States v. All Assets & Equipment of West Side Bldg. Corp., 58 F.3d 1181, 1193 (7th Cir.1995); United States v. 20832 Big Rock Drive, 51 F.3d 1402, 1406 (9th Cir.1995); United States v. 51 Pieces of Real Property Roswell N.M., 17 F.3d 1306, 1315-16 (10th Cir.1994); United States v. 408 Peyton Road, S.W., Atlanta, Fulton County, Georgia, 162 F.3d 644, 652 (11th Cir.1998). See also United States v. Certain Real Property Known as and Located at 1461 West 42nd Street, Miami, Florida, 998 F.Supp. 1438, 1440-41 (S.D.Fla.1998)(requiring repayment of rents or profits during period of illegal seizure when government voluntarily dismissed forfeiture action after seizing real property without notice or hearing); United States v. One 1989, 23 Foot Wellcraft Motor Vessel, 910 F.Supp. 46, 52-53 (D.Puerto Rico 1995), aff'd, 125 F.3d 842, No. 97-1220, 1997 WL 603452 (1st Cir.1997), cert. denied, --- U.S. ----, 119 S.Ct. 79, 142 L.Ed.2d 62 (1998) (adopting majority rule and requiring government to return to claimant any rents collected by government during period of illegal seizure of real property).
 
 
 32
 No panel of the Sixth Circuit has yet addressed the issue of the remedy available for and seizure of real property without pre-deprivation notice and hearing. In United States v. Real Property Known and Numbered as 429 South Main Street, New Lexington, Ohio, 906 F.Supp. 1155 (S.D.Ohio 1995), the Southern District of Ohio, on remand from the Sixth Circuit, endorsed the approaches of the Seventh and Ninth Circuits to hold that violations of the pre-deprivation notice and hearing requirement do not mandate that a forfeiture be set aside. Id. at 1159. We also are persuaded by the approach of the majority of circuits. Where, as in O'Brien's case, the government fails to provide pre-deprivation notice and hearing, but the property is found to be subject to forfeiture after the process due has been afforded, the violation does not immunize the property from forfeiture. 408 Peyton Road, S.W., 162 F.3d at 652; see Marsh, 105 F.3d at 931-32. Rather, the government is responsible for rents and profits of which the claimant was deprived during the period of illegal seizure.[4]
 
 
 33
 Whether claimant O'Brien is entitled to compensation depends upon whether he indeed suffered a Good violation. While the government undeniably seized the defendant property without providing O'Brien pre-deprivation notice or opportunity to be heard, the government contends, and the district court held, that ex parte seizure of the defendant property was warranted under the "exigent circumstances" exception recognized in Good. See Good, 510 U.S. at 62, 114 S.Ct. at 504.
 
 
 34
 To demonstrate "exigent circumstances," the government must show that "less restrictive measures--i.e., a lis pendens, restraining order, or bond--would not suffice to protect the Government's interests in preventing the sale, destruction, or continued unlawful use of the real property." Id. In Good, some four and a half years after seizing drugs and drug paraphernalia from the claimant's home, and after securing a guilty verdict against the claimant, the government filed an in rem action seeking to forfeit the claimant's house and the land on which it was situated. Id. at 46-47, 114 S.Ct. at 497-98. The government sought forfeiture under 21 U.S.C. § 881(a)(7) on the ground that the property had been used to commit or facilitate the commission of a federal drug offense. Id. On August 18, 1989, the Magistrate Judge issued a warrant of arrest in rem authorizing seizure of the property, based on an affidavit recounting Good's conviction and describing the evidence discovered in his home by the police four and a half years earlier. The Supreme Court concluded that the government made no showing of "exigency" to justify postponement of pre-seizure notice and hearing. Id. at 62, 114 S.Ct. at 505.
 
 
 35
 The two cases in which this Circuit has meaningfully addressed Good violations also involved civil forfeitures under 21 U.S.C. § 881(a)(7). United States v. Certain Real Property Located at 16510 Ashton, Detroit, Wayne County, Michigan, 47 F.3d 1465 (6th Cir.1995) involved civil forfeiture proceedings against properties that a former owner allegedly used in drug transactions. The government claimed that while executing search warrants in July 1992, federal agents found drug paraphernalia on the properties. Id. at 1467. Although no criminal charges were brought against the former owner as a result of these searches, the government still sought forfeiture of the properties and seized them without giving to the owner of record either notice or an opportunity to contest the seizure. Id. at 1467-68. We reversed the district court's summary judgment for the United States, holding that the owner of record was entitled to pre-seizure notice and hearing. Id. at 1470-72. United States v. Real Property Known and Numbered as 429 South Main Street, New Lexington, Ohio, 52 F.3d 1416 (6th Cir.1995) involved civil forfeiture proceedings against the claimant's home, out of which on three occasions in August 1991 he sold marijuana to a confidential informant. Id. at 1417. We did not determine whether the government deprived the claimant of his rights under the Due Process clause, but rather remanded the case to the district court to determine whether the government's filing of a lis pendens and execution of an arrest warrant and occupancy agreements effected any seizure that would have required pre-deprivation notice and hearing under Good.[5] Id. at 1421. Unlike the bank fraud and money laundering offenses at issue in the instant case, both of these prior cases involved criminal conduct comparable to the facts of Good. The claimants were suspected or convicted of narcotics offenses that incidentally occurred in or around their homes and the government then sought forfeiture of the homes.
 
 
 36
 The purpose of the government in seeking forfeiture of real property is "to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment." Good, 510 U.S. at 58, 114 S.Ct. at 503. The Supreme Court observed in Good that real property "by its very nature, can be neither moved nor concealed." Good, 510 U.S. at 53, 114 S.Ct. at 500. Therefore in the vast majority of cases, as in Good and in Certain Real Property Located at 16510 Ashton, measures short of outright seizure, such as the filing of a lis pendens, will suffice to notify third parties of the pending forfeiture proceedings and the government's interest in the property. In Good, the Supreme Court distinguished seizures of real property from seizures of personal property by the ability of the personal property owner to frustrate forfeiture by removing, destroying, or concealing the property, which "create[s] a 'special need for very prompt action' that justifie[s] the postponement of notice and hearing until after the seizure." Good, 510 U.S. at 52, 114 S.Ct. at 500 (citations omitted). The urgency of the government's need to exert control over the property arises from this substantial possibility of conversion. See All Assets and Equipment of West Side Bldg. Corp., 58 F.3d at 1192-93.
 
 
 37
 In the instant case, the district court concluded that the government faced a similarly urgent situation--a substantial possibility that the defendant real property might somehow be "converted" or somehow placed forever beyond its reach--that justified immediate seizure without notice to the claimant. First, we note that defendant property was apparently claimant O'Brien's residence and the government concedes that O'Brien had a significant interest in the property. Seizure of the house and land would give the government the right to prohibit sale, evict its occupants, modify the property, condition occupancy, receive rents, and supersede the owner in all rights pertaining to use, possession and enjoyment of the property. See Good, 510 U.S. at 54, 114 S.Ct. at 501. While we agree that the private interest at stake here was substantial, we also recognize that O'Brien's interest in the property is distinguishable from the interests of the claimants in Good, Certain Real Property Located at 16510 Ashton, and Real Property Known and Numbered as 429 South Main Street because O'Brien actively attempted to conceal his ownership of the property by deeding it to a series of other nominal owners.
 
 
 38
 The district court found that exigent circumstances existed which excused preseizure notice. The Supreme Court in Good held "[u]nless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture." Good, 510 U.S. at 62, 114 S.Ct. at 505. In order to establish the existence of exigent circumstances, the government must demonstrate that means less restrictive than an ex parte seizure--including the filing of a lis pendens, restraining order, or bond--would not adequately protect the Government's interests in preventing the sale, destruction, or continued unlawful use of the real property. See id; 408 Peyton Road S.W., 162 F.3d at 651. The government presented evidence that between 1981 and 1993, O'Brien four times orchestrated transfers of the defendant property to sham entities or involuntary trusts without Bank One's knowledge or consent. The government showed that in 1987, he twice obtained fraudulent releases for the mortgages on the property and even recorded the mortgage releases that he had forged. The government offered testimony that O'Brien habitually forged other persons' signatures on legal documents without their knowledge or consent. Although the defendant property itself cannot be concealed, the instant case demonstrates extraordinary lengths to which O'Brien went to conceal or obfuscate the ownership of the property. Indeed, concealing ownership of real property was at the very core of O'Brien's crime both in this case and in the criminal case in which he pleaded guilty to fourteen counts of bank fraud, four counts of money laundering, and one count of criminal forfeiture. Given O'Brien's demonstrated ability to forge mortgage releases, filing a lis pendens would have been of little practical value because such a measure would be inadequate to secure the government's legitimate interests in the property.[6] Given O'Brien's history of forging mortgage releases and transferring title to involuntary trusts, he could easily have forged a release of lis pendens.[7] In that event, regardless of the availability of prior notice or hearing, the government's filing would not prevent O'Brien from transferring the property to a bona fide purchaser who could subsequently mount an innocent owner defense to forfeiture.[8]
 
 
 39
 The promptness and adequacy of later proceedings also figure into our analysis. See Good, 510 U.S. at 53, 114 S.Ct. at 501. An adversary hearing was held after the fact in which probable cause to forfeit the defendant property was found. The hearing occurred over a year and a half after the seizure. To the extent O'Brien suffered any damages as a result of the duration of the seizure, however, he bears a significant portion of the blame. O'Brien himself protracted the period of time between the seizure and adversary hearing by failing to file a verified claim to the defendant property until almost a year after the seizure (despite reminders by the district court and in spite of his filing numerous other motions in the meantime), and by filing several motions to stay the proceedings. We are not persuaded that the district court erred in holding that the presence of exigent circumstances in this case was sufficient to warrant an exigent circumstance exception to the pre-seizure notice and hearing requirement.
 
 III. CONCLUSION
 
 40
 Having carefully considered the record on appeal, the briefs of the parties, the arguments of counsel, and the applicable law, we DISMISS claimant Winterhaven Trust from this appeal for its failure to object to the Magistrate's Report, and we AFFIRM the district court's holding that exigent circumstances justified the ex parte seizure.
 
 
 41
 DAUGHTREY, Circuit Judge, concurring in part and dissenting in part.
 
 
 42
 I concur in the decision dismissing the appeal of the Winterhaven Trust and in the dicta concluding that dismissal of the forfeiture complaint filed against Charles W. O'Brien is not necessarily an appropriate remedy for the ex parte seizure of this claimant's property. I write separately, however, to register my protest of the majority's trivialization of cherished due process principles in the remainder of its opinion.
 
 
 43
 The majority recognizes, as required, the teaching of the Supreme Court in United States v. James Daniel Good Real Property, 510 U.S. 43, 48, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), that "individuals must receive notice and an opportunity to be heard before the Government deprives them of property." Nevertheless, the majority concludes that exigent circumstances excuse an ex parte seizure in this case because less intrusive measures "would not suffice to protect the Government's interests in preventing the sale, destruction, or continued unlawful use of the real property." Id. at 62, 114 S.Ct. 492.
 
 
 44
 In order to determine whether invocation of such an exception is justified, we examine the three factors set forth in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976): "the private interest affected by the official action; the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards; and the Government's interest, including the administrative burden that additional procedural requirements would impose." As the Supreme Court recognized in Good, an individual's right to maintain control over his or her residence and to be free from governmental interference in the quiet enjoyment of that home "is a private interest of historic and continuing importance." Id. at 53-54, 114 S.Ct. 492. Second, "[t]he practice of ex parte seizure ... creates an unacceptable risk of error" by affording little or no protection to an innocent property owner. Id. at 55, 114 S.Ct. 492. Finally, the governmental interest in pre-notice deprivation of property is extremely small. As the Supreme Court determined, "[b]ecause real property cannot abscond, the court's jurisdiction can be preserved without prior seizure." Id. at 57, 114 S.Ct. 492. Additionally, "[s]ale of the property can be prevented by filing a notice of lis pendens ..." and "[i]f there is evidence ... that an owner is likely to destroy his property when advised of the pending action, the Government may obtain an ex parte restraining order, or other appropriate relief, upon a proper showing in district court." Id. at 58, 114 S.Ct. 492.
 
 
 45
 In this case, however, the majority posits that an exception to the general requirement of pre-deprivation notice and a hearing is warranted because the mere filing of a notice lis pendens would have proven futile in protecting the property. According to the majority, O'Brien's history of forging documents to effect illegal property transfers establishes that the claimant would have been able to circumvent the protections established for the property by the filing of a notice lis pendens. I believe, however, that diligent review of court files and a requirement of official document inspection prior to removal of any notices, restraining orders, or bonds would have sufficiently safeguarded the subject property until such time as the probable cause hearing on the forfeiture was conducted. Consequently, I believe the majority erred in concluding that exigent circumstances justify the drastic measure of depriving an individual of a residence without prior notice or an opportunity to be heard.
 
 
 46
 Although finding no due process violation in this case, the majority then undertakes the unnecessary task of determining for this circuit what the proper remedy for a violation should be. Such explication is obviously dicta and is of no precedential value in subsequent forfeiture cases. Because I conclude that an egregious due process violation has occurred in this matter, however, I take this opportunity to express my belief that neither the extreme remedy of dismissal of the forfeiture complaint nor the oftentimes insufficient remedy of reimbursement of rent collected by the government is mandated in all cases. Instead, in this matter, had not the claimant refused at oral argument to accept any remedy short of dismissal, a more appropriate measure of damages for the constitutional violation might well have been set at recompense for O'Brien's inconvenience and the cost of the replacement housing he was forced to procure from the time of the improper seizure until the date on which the probable cause hearing was conducted.
 
 
 47
 Without question, the government has presented compelling evidence of the claimant's criminal wrongdoing. Nevertheless, the bedrock principles of justice and fairness upon which our judicial system is based require that even Charles W. O'Brien receive the process due him before his property is confiscated. In order to preserve those principles, I respectfully dissent from the majority's conclusion that no due process violation has occurred in this matter.
 
 
 
 [1]
 Among other items, the order restrained personal property located in the house, guest house, and shed on the defendant property, and restrained construction supplies allegedly stored in the garage
 
 
 [2]
 In its order of June 17, 1997, the district court held that because both O'Brien and Winterhaven Trust failed to respond to the United State's motion for summary judgment, they failed to meet their burden of submitting sufficient credible evidence such that a reasonable jury could find by a preponderance of the evidence that the claimants were entitled to the property. See United States v. Real Property, 941 F.2d 1428,1439 (11th Cir.1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986))
 
 
 [3]
 Although O'Brien does not address what remedy is warranted where the statute of limitations has run, we are of the opinion that dismissal of the forfeiture under such circumstances would be inappropriate
 
 
 [4]
 The period of illegal seizure may be measured from the date of the illegal seizure itself until the time seizure of the property would have become constitutional, the date of the adversary hearing. See Certain Real Property Known as and Located at 1461 West 42nd Street, Miami, Florida, 998 F.Supp. at 1440
 
 
 [5]
 On remand, the district court held that there was no "seizure" of the claimant's property. United States v. Real Property Known and Numbered as 429 South Main Street, New Lexington, Ohio, 906 F.Supp. 1155, 1158-59 (S.D.Ohio 1995)
 
 
 [6]
 The dissent contends that this case presents us with circumstances not exigent enough to warrant ex parte seizure because methods beyond simply filing a lis pendens, but short of seizure, would protect the property. The dissent suggests that "diligent review of court files and a requirement of official document inspection prior to removal of any notices, restraining orders, or bonds would have sufficiently safeguarded the subject property until such time as the probable cause hearing on forfeiture was conducted."
 The dissent's recommendation, while noble in theory, is too ambitious to succeed in practice. O'Brien's demonstrated efforts to conceal ownership of the defendant property give rise to exigent circumstances precisely because they were both successful and serial. The evidence before us suggests that "diligent review" sufficient to safeguard the defendant property from O'Brien's scams would likely require nothing short of daily visits to the courthouse to review files and documents.
 
 
 [7]
 Both the Magistrate Judge and District Court considered how O'Brien utilized the property in committing the criminal activity that made it subject to forfeiture. The district court observed,
 The record in this action is replete with instances in which the claimant has manifested not only his willingness but his ability to effectuate the preparation and filing of forged or fraudulent documents purporting to substantively affect title to and interest in real property. To argue that the filing of yet another document [i.e., a lis pendens] would provide adequate security to the United States under these circumstances is to ignore the demonstrated ability of the claimant to defraud and subvert the rights of others in this property. In short, this Court agrees with the Report and Recommendation's conclusion that "the presence of exigent circumstances in this case is sufficient to warrant an exception to the pre-seizure notice and hearing requirement."
 (JA 970, citing page 12 of Magistrate's Report and Recommendation ).
 
 
 [8]
 The Tenth Circuit in United States v. 51 Pieces of Real Property Roswell N.M., 17 F.3d 1306 (10th Cir.1994) rejected a similar argument by the government that the claimant's conviction for a money laundering scheme in which he "frequently transferred title to defendant properties through numerous entities, names and individuals in various states, in an effort to control the properties while keeping them hidden," suggested that given notice of an impending seizure, the claimant "would have launched another level of quit claim deeds and other purported property transfers to other real and fictitious or front entities in yet more attempts to continue to conceal the assets from the United States." 17 F.3d at 1315. We decline to follow 51 Pieces of Real Property to the extent it held that the government failed to demonstrate that measures short of seizure would have protected their interest in preventing the claimants from concealing their real property assets through subsequent property transfers